PATENTAS, Ioannis, Appellant in
No. 81-1807,

v.

UNITED STATES of America.

SOTERIS, Ioannis, Appellant in
No. 81-1810,

v.

UNITED STATES of America.

Saul DONER, Esquire, Administrator of
the Estate of Constantinos Spetsiotis,
Andreas Antoniadis, Nicholaos Anto-
niou, Dimitrios Zambelis and Amver
Mehmet, Deceased; and Ioanna C. Spet-
siotis, Dimitrios Spetsiotis, Ioannis Spet-
siotis, Irene Antoniadis, Theodoros An-
dreas Antoniadis, Andreas Andreas An-
toniadis, Efrosini Antonious; and De-
pendent Parents and Sisters of Nichol-
aos Antonious; Dimitrios Zambelis,
Andriana Zambelis; and Dependent
Parents and Sisters of Amver Mehmet,
Appellants in No. 81-1953,

v.

UNITED STATES of America.

ARCO PIPE LINE COMPANY,
Appellant in No. 81-2001,

v.

UNITED STATES of America.

ATLANTIC RICHFIELD COMPANY,
Appellant in No. 81-2002,

v.

UNITED STATES of America.

Nos. 81-1807, 81-1810, 81-1953,
81-2001 and 81-2002.

United States Court of Appeals,
Third Circuit.

Argued April 29, 1982.

Decided Aug. 24, 1982.

William Morrow, Karabel & Morrow, Philadelphia, Pa., for appellants in Nos. 81–1807 and 81–1810.

William G. Downey (argued), Stuart M. Goldstein, Clark, Ladner, Fortenbaugh & Young, Philadelphia, Pa., for appellants in Nos. 81–2001 and 81–2002; Leonard R. Berkowitz, Levittown, Pa. (argued) of counsel.

Sidney J. Smolinsky (argued), Pechner, Dorfman, Wolffe, Rounick & Cabot, Philadelphia, Pa., for appellants in No. 81–1953.

J. Paul McGrath, Asst. Atty. Gen., David V. Hutchinson (argued), Civ. Div., U. S. Dept. of Justice, Washington, D. C., Peter F. Vaira, U. S. Atty., Philadelphia, Pa., for appellee.

Before ALDISERT, WEIS and BECKER, Circuit Judges.

## OPINION OF THE COURT

BECKER, Circuit Judge.

On April 9, 1974, the Greek tanker ELIAS exploded while discharging its cargo of crude oil at the Fort Mifflin terminal in Philadelphia. The vessel was severed; thirteen people were killed; and property damages were in the millions of dollars. These consolidated appeals are taken in five of the many lawsuits that resulted from that disastrous explosion. All of the appellants

seek damages from the United States for an allegedly negligent inspection of the ELIAS by the Coast Guard shortly before the disaster.

These appeals raise two important questions about the duties of the Coast Guard to the crew members of vessels in the navigable waters of the United States and to the owners of property immediately adjacent to those waters. We must decide first whether the appellants have an implied right to sue the government under the Ports and Waterways Safety Act of 1972, 33 U.S.C. §§ 1221–1232 (1976 & Supp. IV 1980) ("PWSA"). We must also determine whether the appellants have stated a claim for relief under the Suits in Admiralty Act, 46 U.S.C. § 742 (1976), by alleging that the Coast Guard failed to exercise due care when it undertook the inspection of the ELIAS as a "good samaritan."

In an unpublished opinion, the district court dismissed these actions on the grounds that the PWSA did not create duties of the Coast Guard to any of the appellants and that the pleadings did not allege facts that satisfied the requisites for good samaritan liability. For the reasons set out in this opinion, we will affirm.[1]

### I.

Because the district court dismissed these actions under Rule 12(b)(6), we assume that the well-pleaded and material allegations of the pleadings are true and view the facts in the light most favorable to the appellants.[2]

### A.

On April 7, two days before the fatal explosion and while she was still at sea, the ELIAS suffered a fire in one of her tanks. The tanker sent an S.O.S. message to the Coast Guard in Norfolk, Virginia at 10:55 p. m.; she cancelled the S.O.S. thirty minutes later, after the fire was extinguished. The next day, the Coast Guard in Norfolk transmitted this information to both the Captain of the Port[3] and the Coast Guard Office of Marine Inspection in Philadelphia. Also on April 8, the ELIAS arrived at the Arco Pipeline Company pier at Fort Mifflin and began discharging her cargo. The tanker's captain and crew did not inform Arco's employees about the previous day's fire, the origins of which had not been discovered.

On the afternoon of April 9, about eight hours before the explosion, Lieutenant Frederick Adamchak of the Office of Marine Inspection boarded the ELIAS specifically to inspect the area of the April 7 fire and to determine whether the tanker could safely continue discharging. After his inspection, Adamchak met on board with two representatives of the Captain of the Port's office. He did not meet the captain of the

1. Because each of these appeals presents the same issues, we treat the appellants as a group. The Arco Pipeline Company and the Atlantic Richfield Company (collectively, "Arco"), appellants in Nos. 81–2001 and 81–2002 respectively, allege that the government is liable for injuries to their dock and shoreside facilities. Arco also seeks indemnification or contribution for damages paid by Arco to other parties under settlement agreements. Ioannis Patentas, appellant in No. 81–1807, and Ioannis Soteris, appellant in No. 81–1810, were members of the ELIAS' crew who were injured in the fire and explosion. Patentas and Soteris seek damages for their personal injuries. The appellants in No. 81–1953 are Saul Doner, administrator of the estates of five crew members killed in the explosion, and the decedents' next of kin. Doner and the next of kin seek wrongful death and survivors' damages.

2. The district court consolidated the lawsuits filed by crew members, visitors, property own-

ers, agents, and charterers with the limitation action brought by the owners and operators of the ELIAS. All of the cases were settled shortly before trial except the actions against the United States from which these appeals are taken. After trial commenced but before the appellants had completed the presentation of their evidence, the government moved to dismiss under Fed.R.Civ.P. 41(b). The district court dismissed under Fed.R.Civ.P. 12(b)(6) instead, properly, because Rule 41(b) provides for dismissal after the plaintiff completes his or her case when "upon the facts and the law the plaintiff has shown no right to relief." In ruling on the propriety of the dismissal, however, we will consider not only the allegations of the complaints but also the offers of proof made in appellants' pretrial memoranda and at trial.

3. The Captain of the Port is the Coast Guard officer responsible for directing Coast Guard law enforcement activities in his or her assigned area. 33 C.F.R. § 6.011–3 (1981).

ELIAS. He did speak with the Chief Mate, but only to inform him of the purpose of the inspection and to ask him some questions about the fire. The Coast Guard representatives remained on board for about one hour. Arco's employees knew that members of the Coast Guard were on the ELIAS, but they did not know the purpose of the visit and apparently did not inquire. Arco alleges that its employees assumed that the inspection was an ordinary spot check, since the Coast Guard frequently boarded tankers at Fort Mifflin.

The ELIAS continued to discharge during and after the Coast Guard inspection. That evening, the ELIAS caught fire and exploded.

### B.

The appellants contend that a reasonable inspection by the Coast Guard would have disclosed the origins of the April 7 fire at sea, which were defects in the tanker's equipment (not identified in the briefs) that also caused the April 9 fire and explosion. Under the circumstances, they say, the Coast Guard did not exercise reasonable care because the inspectors were not expert fire inspectors; they did not interview members of the crew who had witnessed the fire at sea; they did not order immediate cessation of discharging, even though the risk of explosion increased as the tanker emptied;[4] and they did not inform Arco's employees about the fire at sea.

The appellants make two arguments for reversal. First, they assert that they are entitled to sue the government directly under the PWSA, which, they believe, requires the Coast Guard to ensure the safety of tanker discharge operations for the benefit of the tanker's crew and the owners of adjacent property. Second, they assert that they have stated a claim against the government under general maritime tort law, either because they relied on the inspection to their detriment or because the

Coast Guard increased the risk of harm by inspecting the vessel but not stopping the discharging operation. This second argument is based on the familiar tort doctrine of good samaritan liability. See Restatement (Second) of Torts §§ 323, 324A (1965) [hereinafter cited as "Restatement"].

The gist of the government's response is that under the facts and the law the Coast Guard owed no duty of care to the appellants. The government argues that the activities authorized by the PWSA are discretionary and that, in any event, the appellants have no right of action under the Act. With respect to appellants' second ground for reversal, the government contends that appellants have not pleaded or offered to prove facts that satisfy the elements of the good samaritan doctrine.

### II.

We first address the contention that the appellants can sue the United States directly under the PWSA to enforce the Coast Guard's statutory responsibilities. This is a question of first impression. At the time of the events in question, the PWSA provided:

In order to prevent damage to, or the destruction or loss of any vessel, bridge, or other structure on or in the navigable waters of the United States, or any land structure or shore area immediately adjacent to those waters; and to protect the navigable waters and the resources therein from environmental harm resulting from vessel or structure damage, destruction, or loss, the Secretary of the department in which the Coast Guard is operating may—

\*     \*     \*     \*     \*     \*

(4) direct the anchoring, mooring, or movement of a vessel when necessary to prevent damage to or by that vessel or her cargo, stores, supplies, or fuel.

---

4. As the ELIAS discharged its cargo, its tanks filled with air. The oxygen in the air, combined with the fuel vapor in the tanks, made the possibility of explosion almost certain if there

was an ignition source. See In re Complaint of Bankers Trust Co., 651 F.2d 160, 173 (3d Cir. 1982), cert. denied, 455 U.S. 942, 102 S.Ct. 1436, 71 L.Ed.2d 653 (1982).

33 U.S.C. § 1221 (1976) (amended 1978).[5] Subsection (4), on which appellants rely, is one of nine parts empowering the Coast Guard to take actions necessary to control vessel traffic. For example, the Coast Guard may establish vessel traffic control systems for "ports, harbors, and other waters subject to congested vessel traffic," *id.* at § 1221(1); require vessels to carry "electronic or other devices necessary for the use of the service or system," and to install safety equipment, *id.* at § 1221(2), (7); and establish waterfront safety zones and procedures for loading and unloading hazardous cargos, *id.* at § 1221(6), (8).

In *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1975), the Supreme Court articulated four factors for courts to consider in determining whether private rights of action are implicit in statutes that do not expressly provide them.

First, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted,"—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

(Citations omitted.) Subsequent decisions of the Court teach that the third and fourth factors are relevant only if the first two suggest that Congress intended to create a remedy. *E.g., Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,* —— U.S. ——, 102 S.Ct. 1825, 1838–39 & n.60, 72 L.Ed.2d 182 (1982); *Middlesex County Sewerage Authority v. National Sea Clammers Association,* 453 U.S. 1, 13, 101 S.Ct. 2615, 2622, 69 L.Ed.2d 435 (1981). The "ultimate issue" is legislative intent, "but the four factors specified in *Cort* remain the 'criteria through which this intent [can] be discerned.'" *California v. Sierra Club,* 451 U.S. 287, 293, 101 S.Ct. 1775, 1779, 68 L.Ed.2d 101 (1981).

Because we are asked to infer a private right of action against the United States, however, we think that consideration of the second *Cort* factor alone, i.e., evidence of legislative intent to create a remedy, must be dispositive. The government is immune from suit unless Congress explicitly waives that immunity. *United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 1352, 63 L.Ed.2d 607 (1980); *United States v. Testan,* 424 U.S. 392, 399, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976); *Dalehite v. United States,* 346 U.S. 15, 30–31, 73 S.Ct. 956, 965, 97 L.Ed. 1427 (1953). *Mitchell* and *Testan,* both cases in which the Supreme Court was asked to imply a private right of action against the government, do not suggest that this cardinal principle is modified in any way by *Cort v. Ash.*

The plaintiffs in *Testan* sued the government in the Court of Claims for money damages,[6] alleging that their civil service positions had been reclassified in violation of the Classification Act, 5 U.S.C. §§ 5101–5115 (1976 & Supp. IV 1980). The Court of Claims exercised jurisdiction on the basis of the Tucker Act, 28 U.S.C. § 1491 (1976), remanded to the Civil Service Commission, and held that if the Commission determined that the plaintiffs' positions had been erroneously reclassified, the court could award a money judgment to the plaintiffs. The Supreme Court reversed.

---

5. The substance of former § 1221 is now found at 33 U.S.C. §§ 1223, 1225 (Supp. IV 1980).

6. We observe that if the appellants were correct in contending that they can sue the government directly under the PWSA, then their suit would properly be brought in the Court of Claims. The Tucker Act confers jurisdiction on the Court of Claims of "any claim against the United States founded . . . upon . . . any Act of Congress . . . or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491 (1976). The district courts have concurrent jurisdiction of such claims only when they do not exceed $10,000. *Id.* at § 1346. Each of the appellants seeks damages far in excess of that amount.

Emphasizing that the Tucker Act confers jurisdiction only when a substantive right to money damages exists under the statute sued upon, the Court interpreted the question before it as whether Congress intended in the Classification Act to create a right of action for pay lost as a result of an allegedly wrongful reclassification. 424 U.S. at 398–99, 96 S.Ct. at 953. The Court answered this question negatively.

> In a suit against the United States, there cannot be a right to money damages without a waiver of sovereign immunity, and we regard as unsound the argument . . . that all substantive rights of necessity create a waiver of sovereign immunity such that money damages are available to redress their violation.

> \*        \*        \*        \*        \*        \*

> Where the United States is the defendant and the plaintiff is not suing for money improperly exacted or retained, the basis of the federal claim—whether it be the Constitution, a statute, or a regulation—does not create a cause of action for money damages unless . . . that basis 'in itself . . . can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained.'

*Id.* 424 U.S. at 400–02, 96 S.Ct. at 954–55. *See also United States v. Mitchell, supra,* 445 U.S. at 538–40, 100 S.Ct. at 1352–53.

The PWSA does not contain a waiver of sovereign immunity. Its language and its penalty provisions, 33 U.S.C. §§ 1226, 1227 (1976) (amended 1978), which authorize the government to bring civil and criminal actions against persons who violate regulations issued under the Act, do not suggest that a private remedy is available. Thus, there is no explicit indication that the Act mandates compensation by the government for harm to private parties. Only if the legislative history of the Act includes an explicit indication of Congress' intent may we find that Congress has waived sovereign immunity.

■ The appellants assert that there is such explicit evidence, pointing to the following passage in the Senate Report:

> Also, the committee recognizes that there may be potential liability of the Federal Government arising out of the establishment and operation of vessel traffic controls and that this risk may be greater where an active vessel control system is in effect (see pages 35 and 43 of the committee hearings Serial No. 92–39). However, the committee agrees with the Coast Guard's statement "that the potential benefits of increased port safety will far exceed the potential exposure of the Federal Government to tort liability."

S.Rep.No.724, 92d Cong., 2d Sess. 32, *reprinted in* 1972 U.S.Code Cong. & Ad.News 2766, 2792. The hearing testimony incorporated by reference in the Senate Report comprises statements prepared by the Commandant of the Coast Guard and by the Department of Transportation on the contingent liability of the United States for the operation of vessel traffic control systems. Both documents were submitted at the request of Senator Cook. *Navigable Waters Safety and Environmental Quality Act: Hearings on S. 2074 Before the Senate Comm. on Commerce,* 92d Cong., 1st Sess. 34–35, 41 (1971). These statements do not show that Congress contemplated private enforcement actions under the PWSA, as appellants assert, but rather that Congress expected that agents of the government could be held liable in tort. The Coast Guard statement draws an analogy "between the liability which would arise from the operation of a marine traffic system and that which presently arises from the operation of the air traffic control system." *Id.* at 35 (statement of Admiral Chester R. Bender). The Transportation Department's statement also makes this comparison and clarifies that negligence would be the basis of any federal liability. *Id.* at 44 (statement of Assistant Secretary Robert F DeSimone).

■ We therefore do not agree that the legislative history provides any support for appellants' position that they have a right of action under the PWSA. As we have said, there is no evidence of an explicit waiver of sovereign immunity. Rather, Congress intended that the existing waiver

of sovereign immunity from suit for maritime torts committed by government agents would apply to the Coast Guard's activities under the PWSA, in appropriate circumstances. This waiver is found in the Suits in Admiralty Act, appellants' alternative basis for recovery, addressed below.

Our conclusion that appellants cannot proceed directly under the PWSA is bolstered by consideration of the first *Cort* factor, i.e., whether the Act creates federal rights in their favor. The appellants contend that as persons on "any vessel ... in the navigable waters of the United States" and owners of "any land structure or shore area immediately adjacent to those waters," they are within the class for whose "especial benefit" the PWSA was passed. On its face, though, the Act presents two obstacles to the appellants. First, it appears to be "intended to benefit the public at large through a general regulatory scheme," *California v. Sierra Club, supra*, 451 U.S. at 298, 101 S.Ct. at 1781 (construing Rivers and Harbors Appropriation Act). Certainly the appellants are among the persons who would benefit from the Coast Guard's activities, but this does not suffice to establish enforceable duties to them. The important question is whether Congress intended to give them federal rights. *Id.* at 294, 101 S.Ct. at 1779; *see Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran, supra*, —— U.S. at ——, 102 S.Ct. at 1838 (Court has traditionally refused to infer remedy from statutes that are regulatory provisions "enacted for the benefit of the public at large.")

Second, the language of the Act is permissive, not mandatory. It is elementary that the PWSA cannot create enforceable federal rights in favor of the appellants if the Coast Guard's activities under the Act are discretionary. *See Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1, 15, 101 S.Ct. 1531, 1538, 67 L.Ed.2d 694 (1981). The legislative history of the Act proves what its language suggests, that the activities it authorizes are not mandatory. The House Report states flatly that "your committee feels that it should be pointed out that Section 2 of the bill, which estab-lishes the authority for traffic control systems, is permissive and uses the word 'may' rather than the word 'shall,' in setting up the authority in the Coast Guard to operate traffic control systems." H.R.Rep.No.563, 92d Cong., 1st Sess. 8 (1971). *Accord*, S.Rep.No.724, 92d Cong., 2d Sess. 32, *reprinted in* 1972 U.S.Code Cong. & Ad.News 2766, 2791–92.

For all of the reasons discussed, we hold that the appellants do not have an implied right of action against the government under the PWSA.

### III.

■ The appellants' second theory of recovery is based on the Suits in Admiralty Act ("SIAA"), which waives the sovereign immunity of the United States from suit for maritime torts committed by its agents. The Act provides:

> In cases where if such vessel were privately owned or operated, or if such cargo were privately owned or possessed, or if a private person or property were involved, a proceeding in admiralty could be maintained, any appropriate nonjury proceeding in personam may be brought against the United States.

46 U.S.C. § 742 (1976). The SIAA is the exclusive remedy against the United States for maritime torts. 28 U.S.C. § 2680(d) (1976); *Beeler v. United States*, 338 F.2d 687, 689 (3d Cir. 1964). In contrast to the Federal Tort Claims Act, 28 U.S.C. § 1346(b) (1976), the SIAA does not incorporate state tort law, inasmuch as maritime tort law is federal law. *E.g., Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 628, 79 S.Ct. 406, 408, 3 L.Ed.2d 550 (1959); *Pope & Talbot, Inc. v. Hawn*, 346 U.S. 406, 409–10, 74 S.Ct. 202, 204–05, 98 L.Ed. 143 (1953).

The appellants contend that if a private person had undertaken the inspection of the ELIAS, under the facts and maritime tort law, that person would be liable for the appellants' respective injuries. The appellants specifically rely on the good samaritan principle, which makes one person liable to

another for breach of a duty voluntarily assumed by affirmative conduct, even when that assumption of duty is gratuitous. *See Indian Towing Co. v. United States*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955); Restatement, *supra*, §§ 323, 324A. It is appellants' position that the requisites of the principle are satisfied because the Coast Guard negligently increased the risk of harm by allowing the ELIAS to continue discharging her cargo, or, alternatively, because they relied on the Coast Guard to ensure that the discharging operation was safe.

The good samaritan doctrine incorporates two theories of recovery, depending on whether the injured person is the direct beneficiary or a foreseeable third party beneficiary of gratuitously rendered services, neither of which, the government contends, apply to the facts of these cases. First, the government asserts that good samaritan liability is foreclosed because the inspection of the ELIAS was incontrovertibly for the benefit of the government or the public at large, but not for the benefit of the appellants.[7] Second, the government argues that it may be held liable to third

parties only if they rely to their detriment on its undertaking, and not merely because its agents negligently increase the risk of harm. Third, it asserts that the appellants here have not stated a claim based on detrimental reliance.

■■■■■ Federal courts recognize the good samaritan rule as part of maritime tort law.[8] We think that Restatement sections 323 and 324A state the rule correctly. Section 323 provides:

Negligent Performance of Undertaking to Render Services

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

(a) his failure to exercise such care increases the risk of such harm, or

(b) the harm is suffered because of the other's reliance upon the undertaking.

Section 324A provides:

Liability to Third Person for Negligent Performance of Undertaking

---

7. The government does not raise in this context its argument that inspections by the Coast Guard are discretionary. Unlike the Federal Tort Claims Act, *see* 28 U.S.C. § 2680(a) (1976), the SIAA does not contain an explicit discretionary function exception from its waiver of sovereign immunity. The First, Seventh, and District of Columbia Circuits have concluded nonetheless that "sound principles demand that the act be construed as subject to such discretionary function exception," *Gercey v. United States*, 540 F.2d 536, 539 (1st Cir. 1976), *cert. denied*, 430 U.S. 954, 97 S.Ct. 1599, 51 L.Ed.2d 804 (1977) (immunity from liability for Coast Guard's failure to adopt policies designed to protect public from decertified passenger vessels); *accord, Canadian Transport Co. v. United States*, 663 F.2d 1081, 1085 (D.C.Cir. 1980) (immunity from liability for Coast Guard's refusal to permit vessel to enter port); *Bearce v. United States*, 614 F.2d 556, 559–60 (7th Cir.), *cert. denied*, 449 U.S. 837, 101 S.Ct. 112, 66 L.Ed.2d 44 (1980) (immunity from liability for Coast Guard's failure to erect light at end of breakwater); *see also Rappenecker v. United States*, 509 F.Supp. 1024, 1026–27 (N.D. Cal.1980). The Fourth and Fifth Circuits disagree. *Lane v. United States*, 529 F.2d 175, 179 (4th Cir. 1975) (no immunity from liability

when Coast Guard abused its discretion by failing to mark sunken barge); *De Bardeleben Marine Corp. v. United States*, 451 F.2d 140, 145–46 (5th Cir. 1971) (discretionary function exception should not be read into SIAA because waivers of sovereign immunity are liberally construed). This court has not ruled on this question and we decline to do so now since it is not necessary to our decision.

8. Federal courts have also, and more frequently, applied the good samaritan rule in Federal Torts Claim Act cases, when the rule was a part of the applicable state law. These cases, like the appeals before us, have involved allegations that the government violated its own regulations or its statutory responsibilities when it undertook inspection or certification activities. *See, e.g., Raymer v. United States*, 660 F.2d 1136 (6th Cir. 1981), *cert. denied*, —— U.S. ——, 102 S.Ct. 2009, 72 L.Ed.2d 466 (1982) (Bureau of Mines inspection); *United Scottish Ins. Co. v. United States*, 614 F.2d 188 (9th Cir. 1979) (Federal Aviation Administration inspection and certification); *Blessing v. United States*, 447 F.Supp. 1160 (E.D.Pa.1978) (Occupational Health and Safety Administration inspection).

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

(a) his failure to exercise reasonable care increases the risk of such harm, or

(b) he has undertaken to perform a duty owed by the other to the third person, or

(c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

The government takes the position, mentioned above, that detrimental reliance is the sine qua non of governmental liability as a good samaritan. In other words, it contends that the Restatement formulation is not correct when an agent of the government is the actor. It advances this argument on the strength of cases that have held the Coast Guard negligent for, e.g., failing to maintain a lighthouse in operable condition, *Indian Towing Co. v. United States, supra* ; failing to mark a submerged barge, *Lane v. United States, supra* note 7; and failing to keep nautical charts accurate, *De Bardeleben Marine Corp. v. United States, supra* note 7.

▪ It is true that detrimental reliance has frequently been the reason for injury when a government agent acted as a good samaritan. It does not follow, however, that if a government agent actually increases the risk of harm within the meaning of the Restatement that the government should not be liable for such negligence. The SIAA makes the government liable in the same circumstances in which a private person would be liable. In *Frank v. United States*, 250 F.2d 178 (3d Cir. 1957), *cert. denied*, 356 U.S. 962, 78 S.Ct. 1000, 2 L.Ed.2d 1069 (1958), this court considered the scope of the Coast Guard's liability for a failed rescue attempt, which was voluntarily undertaken. Judge Hastie wrote for the court that, based on the responsibilities of private salvors, the government might be liable either if the injured person relies on "some representation about the voluntary service" or if the attempted rescue "is so conducted that it affirmatively injures the one in distress or worsens his positions [sic]." *Id.* at 180. Since the Restatement formulation of the good samaritan doctrine generally prescribes the circumstances of private liability and reflects accepted principles of duty and tort liability, we do not think that the Restatement test should be specially limited when the government is involved.

The Supreme Court's decision in *Indian Towing Company v. United States, supra*, is not to the contrary. In that case, a tugboat and a barge ran aground because a lighthouse operated by the Coast Guard was not functioning. Indian Towing Company alleged that the government was negligent for failing to maintain the lighthouse or for failing to warn vessels that it was inoperative. The Court held that the company might recover damages if negligence were proven:

The Coast Guard need not undertake the lighthouse service. But once it exercised its discretion to operate a light on Chandeleur Island and engendered reliance on the guidance afforded by the light, it was obligated to use due care to make certain that the light was kept in good working order; and, if the light did become extinguished, then the Coast Guard was further obligated to use due care to repair the light or give warning that it was not functioning.

350 U.S. at 69, 76 S.Ct. at 126. *Indian Towing* established that government may be held liable for its good samaritan activities if reliance is proven. It did not suggest, however, that the government may not be held liable *unless* reliance is proven. The decision makes clear that some element in addition to the undertaking itself must be proven, but consistent with *Indian Towing* that element might be an increased risk of harm.[9]

---

**9.** Two courts of appeals have suggested in Fed-      eral Torts Claims Act cases that reliance is an

Accordingly we reject the government's contention and adopt the Restatement formulation in full. The appellants assert a right to recover under both sections 323 and 324A, and under either the theory of detrimental reliance or increased risk of harm. Our task is to apply the good samaritan rule to the facts of these cases to determine whether the appellants have stated claims for relief.

The foundation of the good samaritan rule is that the defendant specifically has undertaken to perform the task that he or she is charged with having performed negligently. In *Evans v. Liberty Mutual Insurance Co.*, 398 F.2d 665, 666–67 (3d Cir. 1968), we discussed the scope of the undertaking necessary to support good samaritan liability for a negligently performed inspection.[10] The *Evans* plaintiff, an employee, was injured while attempting to dismantle a cutting machine. The defendant, the employer's workers' compensation carrier, had made selective inspections of the employer's plant but had never inspected the cutting machine. We concluded that, absent a showing either that the defendant had undertaken to inspect the specific instrument causing the injury or to inspect the entire plant of which that instrument was a part, the employee could not recover. In other words, the scope of a good samaritan's duty is measured by the scope of his or her undertaking.

In the cases before us, the scope of the undertaking poses no difficulty for the appellants. They allege, and the government agrees, that Adamchak boarded the ELIAS specifically to inspect the site of the fire at sea and to determine whether the tanker could safely discharge her cargo. We conclude accordingly that the Coast Guard's undertaking created a duty to the appellants either under section 323 or 324A. The government may be held liable under section 323 only if the Coast Guard inspected the ELIAS for the benefit of the appellants. But because the inspection was authorized by the PWSA, and for the same reasons that we cannot conclude that the PWSA creates duties to anyone other than the public generally, *see page 712 supra*, we find that section 323 is inapplicable. The correct approach is to predicate the government's liability, if any, on section 324A. We noted in our discussion of the PWSA that the appellants clearly would benefit from the Coast Guard's performance of the activities authorized by the statute, and we have no difficulty concluding that each of the appellants was a third person who was a foreseeable beneficiary of the inspection.

Section 324A specifies three circumstances in which the injury may be proximately caused by the negligent performance of an undertaking. Appellants rely on subsections (a) and (c). Subsection (a) applies if the negligence increased the risk of harm. The appellants argue that the Coast Guard increased the risk of explosion by failing to discover the cause of the fire and failing to stop the discharge. They attempt to strengthen this argument by pointing out that the risk of explosion increases as a tanker discharges its cargo of oil, *see* note 4 *supra.*

These allegations, which are appellants' sole allegations with respect to increased risk, do not meet the requisites of section 324A(a). Their critical defect is the appellants' inability to identify sins of commission rather than omission. In the appellants' construction, the requirement of sub-

---

integral part of governmental good samaritan liability. *Raymer v. United States,* supra note 8, 660 F.2d at 1143; *United Scottish Ins. Co. v. United States, supra* note 8, 614 F.2d at 194–95. At the same time, both courts relied on the full Restatement test, and the *Raymer* court analyzed the increased risk of harm theory as well as the detrimental reliance theory of recovery. Neither case therefore provides unambiguous support for the government's position. To the extent that these cases may be inconsistent with our holding, we reject their reasoning.

**10.** *Evans* was a diversity action to which Pennsylvania law applied. Nonetheless, the *Evans* decision is instructive because we construed Restatement §§ 323 and 324A, which are part of Pennsylvania law. *See generally Blessing v. United States, supra* note 8, 447 F.Supp. at 1187–88.

section (a) that the Coast Guard's "failure to exercise reasonable care increases the risk of such harm" merely restates the predicate requirement of section 324A that "physical harm result[ed] from [the Coast Guard's] failure to exercise reasonable care to protect [its] undertaking." But the language of the Restatement assumes that the injuries result in fact from the defendant's negligent performance of his or her undertaking before it reaches the issue of increased risk, which is a question of legal causation. Moreover, the comment to section 324A(a) makes clear that "increased risk" means some physical change to the environment or some other material alteration of circumstances. Restatement, *supra*, § 324A, Comment c, Illustration 1. *See also Frank v. United States, supra.* Thus the appellants have not made adequate allegations or offers of proof of increased risk of harm and cannot go forward under § 324A(a).

The appellants' other theory of causation is detrimental reliance, *see* Restatement, *supra*, § 324A(c). In this regard they rely primarily on the Supreme Court's decision in *Indian Towing Co. v. United States, supra.* The appellants' sole assertion is that here, as in *Indian Towing*, once the Coast Guard undertook to inspect the ELIAS, it engendered reliance and was obligated to use due care. We are not persuaded, however, that these appeals are analogous to *Indian Towing* or other cases in which parties have recovered from the government under a reliance theory. *See* page 714 *supra* (citing cases). None of the appellants alleges knowledge of the purpose of the Coast Guard's inspection, and Arco admits that its employees did not even know of the

fire at sea. We do not understand how appellants could have relied on Adamchak's conclusion that the ELIAS could safely discharge her cargo when they did not know that he had inspected the tanker to decide that question or even that there was a question about the safety of discharging. This lack of knowledge distinguishes these cases from, e.g., *Indian Towing*, in which there was no question that the tugboat pilot knew about the lighthouse; and *De Bardeleben Marine Corp. v. United States, supra*, in which there were allegations that the plaintiff had used an inaccurate nautical chart prepared by the Coast Guard.[11]

Moreover, knowledge alone would not suffice to state a claim for detrimental reliance. The appellants would also have to allege that their knowledge of the Coast Guard's undertaking "induced [them] to forgo other remedies or precautions against [the] risk," Restatement, *supra*, § 324A, Comment e; *see also id.* at Illustration 5. No such allegations appear in these cases, and, at oral argument, counsel for appellants could not point to any such evidence.

We are accordingly satisfied that appellants have not stated claims under either the increased risk or detrimental reliance theories of the good samaritan rule as set out in section 324A.

## IV.

In sum, the appellants cannot sue the government directly under the PWSA, and they have not stated claims for relief under the SIAA. The judgment of the district court will be affirmed.

---

**11.** The First Circuit observed in *Zabala Clemente v. United States*, 567 F.2d 1140 (1st Cir. 1977), *cert. denied*, 435 U.S. 1006, 98 S.Ct. 1876, 56 L.Ed.2d 388 (1978) (Federal Torts Claims Act case) that at least one relationship between agents of the government and private parties is inherently "imbued with reliance," that between air traffic controllers and pilots and passengers. The court refused, however, to say that the relationship between a Federal Aviation Administration inspector and pilots and passengers has the same quality. It concluded:

> There is no indication in the present case that plaintiffs' decedents or any one else for that matter have ever relied on the FAA to inspect a charter aircraft before they embark on a private flight. We doubt that the Supreme Court in *Indian Towing* would have found liability if the government's negligence simply amounted to failing to construct a lighthouse as ordered by a Coast Guard official when the seafaring public was unaware that such an order had been given, and the lighthouse was never operational.
>
> 567 F.2d at 1148.