NOT RECOMMENDED FOR PUBLICATION
File Name: 04a0164n.06
Filed: December 16, 2004

**No. 03-6277**


**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**


**GERALDINE MERRILL, Individually
and as Administratrix of the Estate of
Gary Merrill, and as Parent and Next
Friend of Kayla Merrill, a Minor, and
KAYLA MERRILL, a Minor,**

      **Plaintiffs-Appellants,**

**v.**

**ARCH COAL, INC. and LONE MOUNTAIN
PROCESSING, INC.,**

      **Defendants-Appellees.**

**ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF
KENTUCKY**

_____/


**BEFORE:**    **KEITH, CLAY and COOK, Circuit Judges.**

      **CLAY, Circuit Judge.**  Plaintiffs Geraldine and Kayla Merrill appeal from the September

5, 2003 Judgment of the United States District Court for the Eastern District of Kentucky, granting

summary judgment to Defendant Arch Coal, Inc. ("Arch"), in this wrongful death action. For the

reasons set forth below, we **REVERSE** the district court's judgment and **REMAND** the case for

further proceedings.

**I.**    **BACKGROUND**

*Procedural History*

Plaintiffs are the widow and minor child of Gary Merrill, a deceased coal miner. Plaintiffs filed this action on October 7, 1999, in Kentucky state court.[1] Defendants removed the case to federal district court pursuant to 28 U.S.C. § 1441 and 28 U.S.C. § 1332. Plaintiffs filed a timely motion to remand the case back to state court, which the district court denied on May 2, 2000.

Defendant Arch moved for summary judgment on November 2, 2001. The district court initially denied Arch's motion on March 25, 2002. However, the case was later reassigned to a different district court judge, and Arch renewed its motion. On September 5, 2003, the district court granted summary judgment to Arch.

Plaintiffs filed a timely Notice of Appeal with this Court on September 26, 2003.

### *Substantive Facts*

### A.    Introduction

Decedent Gary Merrill ("Merrill") was a continuous mining machine operator at the Darby Fork Mine in Harlan County, Kentucky. Around 11:00 p.m. on October 9, 1998, Merrill began work inside Darby Fork Mine No. 1. At approximately 12:25 a.m. on October 10, Merrill was killed when a very large piece of rock from the mine's roof fell on top of him.

Merrill was an employee of Lone Mountain Processing, Inc. ("Lone Mountain"), which owns and operates the Darby Fork Mine. Lone Mountain, in turn, is a subsidiary of Defendant Arch. Arch is a Delaware corporation with its corporate offices in St. Louis, Missouri. Arch owns various

---

[1]Plaintiffs' initial Complaint named as Defendants Arch Coal, Inc., Lone Mountain Processing, Inc., Catenary Coal Holdings, Inc. and Ark Land Company. The claims against Lone Mountain were dismissed on July 21, 2000 due to the exclusive liability provision of the Kentucky Workers' Compensation Act, and summary judgment was granted in favor of Catenary and Ark on March 25, 2002. The only Defendant currently before us is Arch.

mines in different regions of the country, each of which operates as a separate subsidiary. Lone Mountain's general manager answers to the vice-president of Arch's eastern division, and all of Lone Mountain's budgets are submitted to Arch's corporate offices in St. Louis.

Lone Mountain operates two separate mines in Harlan County, the Darby Fork Mine and the Huff Creek Mine. Work is completed in three shifts, each of which begins with a meeting to discuss the work to be performed on the shift and any safety issues that have arisen. Each shift also holds a safety meeting once per week, attended by the mine manager and superintendent, safety manager, shift supervisors, section foreman and all of the miners who work on the shift. Finally, the mine managers, safety manager and preparation plant manager meet once a month at the mine's offices to discuss various issues, including safety.

Darby Fork is an underground mine, which is mined using the "room and pillar" method. In the room and pillar method, coal is mined using a continuous mining machine, which breaks the coal from the walls of the mine and moves it into a shuttle car. The shuttle car takes the coal to a conveyor belt, and eventually to the surface. As the coal is mined, it is cut into "rooms" of open spaces and "pillars" of coal left in between. The pillars support the mine roof, which is reinforced with roof bolts. The bolts prevent the ceiling from collapsing. As the mining is completed, the pillars are removed in a process called retreat mining. At the time of Merrill's death, his unit was retreating.

## B. Mine Roof Control

Roof control is a primary safety issue in any coal mine because of the potential for catastrophe when the roof collapses. The Mine Safety and Health Administration ("MSHA"), a

3

division of the Department of Labor, mandates that all mines "shall develop and follow a roof control plan, approved by the District Manager, that is suitable to the prevailing geological conditions, and the mining system to be used at the mine." 30 C.F.R. § 75.220(a)(1) (2004). Lone Mountain was responsible for submitting its own roof control plan to MSHA for approval.

MSHA performed an investigation and issued a report following Merrill's death. The report concluded:

> The mine roof fell as a result of a failure of the installed roof control system. The installed roof bolts failed as a result of both horizontal and lateral loading on the roof bolts which was caused by second mining in the area. The second mining had caused additional weight to be shifted to the area of the accident which resulted in lateral movement in the immediate roof along the previously detected bedding plane. Despite increasing overburden pressures, adverse, and deteriorating roof and rib conditions being present, the mine operator failed to install additional roof support in order to support or otherwise control the mine roof where miners worked and traveled.

MSHA issued a citation to Lone Mountain pursuant to 30 C.F.R. § 75.202(a).[2] In the citation, MSHA concluded that "The mine operator was aware that there was a separation in the roof strata seven (7) inches above the roof line. No additional support was provided in this area despite increasing overburden pressure and deteriorating roof conditions." The Kentucky Department of Mines and Minerals also issued two citations to Lone Mountain on October 12, 1998, for failure to fully comply with the mine's roof control plan.

---

[2] Section 75.202(a) provides: "The roof, face and ribs of areas where persons work or travel shall be supported or otherwise controlled to protect persons from hazards related to falls of the roof, face or ribs and coal or rock bursts."

4

The MSHA citation alludes to a seven inch crack in the roof strata. Approximately half an hour prior to the accident, a mine employee discovered the crack in a test hole. Several of Merrill's co-workers in the mine told Kentucky and MSHA interviewers that Merrill checked the roof prior to the accident and that nothing had seemed out of the ordinary. Gaither Frazier, Darby Fork's mine manager, confirmed the detection of the seven inch crack, but maintained that Arch was not notified until after the accident.

Apparently roof falls were common at Lone Mountain, although fatal injuries were not. Frazier testified, "Yeah, we had quite a few falls . . . seems like about every year we had ten to fourteen falls." The MSHA accident report notes that a few days prior to Merrill's death, another miner was injured during a roof fall, however Frazier denied that anyone from Arch's office was notified about the incident. Ken McCoy, Arch's Corporate Director of Safety, acknowledged being aware of roof falls at Lone Mountain, although he testified that "the fact that we have a roof fall would not cause me any particular alarm. Now, if we had people hurt in them, that would be different, but the fact that we have a roof fall, I mean a roof fall in an underground coal mine is not at all uncommon." Despite his purported lack of concern, McCoy visited Lone Mountain prior to Merrill's death and spoke with both Frazier and Eugene Sharp, Lone Mountain's general manager. Sometime in late August or September 1998, McCoy and Frazier went "underground" into the mine to look at the roof.

McCoy testified that he and Frazier discussed "things that we could do to reduce the number of roof falls we had." They specifically discussed the width of the roadway inside the mine, which was 20 feet; McCoy suggested to Frazier that narrowing the roadway to 18 feet could help with the

5

roof control problem, because a narrower roadway decreases the width of the roof span, which in turn makes the roof stronger. During his deposition for this case, McCoy testified that although he did not remember clearly, he suspected that he and Frazier discussed the type of bolts being used in the Darby Fork mine. McCoy explained that at the time of Merrill's death, Lone Mountain used 48-inch fully grouted resin roof bolts. According to McCoy, this means that "you . . . build a beam and it will go across and it will rest on the pillars," with the bolts holding the beam. This is what is known as a "passive" system; essentially, the layers of roof are fused together with bolts, which are bonded directly to the rock with resin. McCoy also testified that Lone Mountain had "super bolts" available to augment the 48-inch bolts. A super bolt is a longer bolt used for extra support, and is usually of a higher grade. Super bolts may be used in areas of the roof that are less strong, or areas where problems have occurred. McCoy testified that at the time of his underground inspection with Frazier, he "remember[ed] discussing and concluding" that the passive system then in place "was adequate."

Following Merrill's death, Sharp compiled an internal report on the accident, which was sent to Jeffrey Hoops, vice-president of Arch's eastern division. In the cover letter, dated October 20, 1998, Sharp claims that the bolts used in Merrill's section were "5/8" grade 60 fully-grouted bolts," and that "we had already changed the entire mine over to a 3/4" grade 75 double lock bolt approximately six (6) weeks prior to the accident. This bolt is designed to put the rock in tension . . ." Sharp's memo was contradicted by McCoy's testimony that a tension system was not in place in the spot where Merrill was working when he died. Additionally, Frazier's testimony confirmed that a tension system was not introduced over the entire Darby Fork mine until after Merrill's death.

In the time immediately before and after Merrill's death, two studies were done on Lone Mountain's roof bolting system. The studies were completed by two bolt manufacturers, Excel Mining Systems ("Excel") and the Jennmar Corporation ("Jennmar"). The Excel study was completed in August 15, 1998, and was addressed to Frazier. The report recommended that a "tension" system be installed. In a tension system, an anchor is added to the top of the roof bolt, creating tension that holds the rock together. Excel's report states, "It is my opinion from observing conditions that tension needs to be applied to the roof to try and compress laminations to form a bend. Tension would also help in trying to prevent lateral shift." Jennmar completed "roof bolt anchorage tests" on October 7, 1998, several days before Merrill's death. The result of the test was to recommend a 60-inch anchored bolt, as opposed to a 48-inch bolt. On October 26, 1998, Jennmar issued a "ground control analysis" report, which made several recommendations including the implementation of a "fully-tensioned primary support system." In addition, Lone Mountain requested and received price quotes and information on both Excel and Jennmar bolts from its supplier, United Central Industrial Supply Company, on September 4, 1998.

McCoy denied having knowledge of the Excel or Jennmar reports until after Merrill's death. Hoops also denied knowing the specifics of the reports, but acknowledged that if Lone Mountain was considering changing its roof bolting system, he and Sharp "probably . . . would have had some discussions," and he "would have been aware that they were making some changes." McCoy admitted that after Merrill died, he discussed implementing a tension system with Lone Mountain management as one possible option to avoid more fatalities. Furthermore, in January 1999, McCoy was hired by Lone Mountain as its new general manager, and under McCoy's watch Darby Fork

used a tension system.[3]  Frazier testified that following Merrill's death and the outside studies, everyone concurred that a tension system would be better.

###### C.    Overall Safety

Lone Mountain was responsible for creating its own internal safety plan.  Steven Leer, Arch's then President and CEO, testified that Arch essentially set a minimum acceptable safety level, as well as a standardized method for reporting safety statistics and information to the corporate offices; however, it was up to the individual mine management staff to implement safety and form their own mine-specific safety plan.  Leer further testified that safety is a major corporate-wide concern and that Arch often emphasizes safety to its subsidiaries.  Arch's corporate vision statement reads, "Our Goal: To be the Safest, Lowest Cost, Most Productive Miners in the World."  Leer stressed that although safety is a "core value" for Arch, keeping individual miners safe is ultimately the subsidiary's responsibility.  To that end, Arch included safety lessons in its management training program, which was attended by all managers, from mine supervisors to upper-level management, who worked under the Arch organizational umbrella.  Arch also distributed safety awards to the safest divisions and subsidiaries.

Arch relied on McCoy, as Corporate Director of Safety, to instill the corporate culture of safety in its subsidiaries.  McCoy testified that his job "was to convince anybody that would listen

---

[3] McCoy confirmed that the mine used a tension system while he was general manager, but he could not recall whether he actually implemented the system or whether it was implemented before he worked for Lone Mountain.  What is clear from McCoy's testimony is that the area where Merrill died was using a passive system on October 10, 1998.

In addition to McCoy replacing Sharp as general manager, Frazier was "relieved of his duties" shortly after Merrill died.

to me, particularly the division presidents and the mine managers, that safety is a wise investment because safety requires you to take care of processes, policies, procedures, attend to details." McCoy was responsible for ensuring that Lone Mountain was following its safety programs, conducting annual training programs, and fulfilling reporting requirements. McCoy also reviewed Lone Mountain's safety program.

While McCoy influenced the safety decisions of Lone Mountain's management, it is unclear how much influence he had on final decisions at the mine. Arch's CEO Leer characterized McCoy's role as that of a "consultant," claiming McCoy was not responsible for a subsidiary's safety program, but rather "he's responsible that they have a safety program." Frazier testified that although he was not required to follow any recommendations that McCoy made, he would have considered them. Leer corroborated Frazier's testimony, claiming that if McCoy raised issues with the subsidiaries they would probably listen, but that McCoy did not have the power to fire noncomplying subsidiary managers.

McCoy testified that he visited every subsidiary, including Lone Mountain, at least once per quarter. McCoy denied that Lone Mountain was having any significant safety problems, although as noted above, he did visit the mine and conduct an underground tour prior to Merrill's death. Sharp corroborated this, noting that McCoy only visited Lone Mountain three or four times, claiming it had a generally good safety record. Thus, according to Sharp, McCoy primarily reviewed Lone Mountain's safety reports. McCoy acknowledged receiving reports whenever an MSHA reportable accident occurred at Lone Mountain. McCoy also agreed that he rarely met with general manager Sharp, although he did meet with Frazier and Ronnie Biggerstaff, Lone Mountain's

9

safety manager. Frazier also testified that McCoy may have attended some of Lone Mountain's weekly safety meetings.

There is evidence that Lone Mountain was having safety problems in the months before Merrill's death. A memorandum from Sharp to other Lone Mountain executives styles itself as "a suggested plan of action to reverse the negative trend in Lone Mountain's safety performance. After careful review of out recent rash of injuries and citations, it is obvious that our focus on safety is not at the level that is (sic) should be." A second memorandum from Sharp, dated July 13, 1998, and addressed to all Lone Mountain employees states,

> The first half of 1998 was disastrous in regard to Safety. I can not (sic) emphasize enough the need for each of us to recommit ourselves to working safely and insuring that everyone around us works in a safe manner. If each of us pulls together, we can work the remainder of 1998 without a MSHA reportable injury.

Neither of Sharp's memos were addressed to McCoy, but McCoy was aware that some safety problems were occurring at Lone Mountain. McCoy's take on those problems was as follows:

> Well, I would characterize it this way: Lone Mountain had historically had an exemplary safety record. In fact, they were the model for all of the operations, had won a medal in safety, for that matter. They were the safest coal mine in the nation. Over the last – oh, I don't know the exact time period, but the incident rates at both mines were not as good as they had been.
>
> Now, putting that in context, though, they were still considerably better than the national average. At Arch, we wanted to be the very best.

In addition to McCoy's contacts with Lone Mountain, Hoops noted that he "talked to the division presidents [such as Sharp] frequently so typically I was aware on a regular basis if there were problems, whether safety related or production related or whatever." Sharp testified that

Hoops was his boss, and thus Sharp submitted monthly activity reports to Hoops, which contain Lone Mountain's monthly safety record. The reports for 1998 document a pattern of problems in the Darby Fork Mine, including double-digit MSHA citations in February, March and June, and roof control problems in June and August. The June safety report notes two lost time accidents, and as a result "[r]oof and rib control is being communicated to all employees in safety talks and foremen's meetings." In August 1998, there were only three MSHA citations, but the safety report notes that one section of the mine "had poor roof conditions throughout the month," and in another section of the mine "we are still taking short cuts . . . because of the broken roof."

McCoy appears to be the only Arch employee who expressed any concern or took any action in regard to Lone Mountain's specific safety issues. Hoops was certainly aware of problems, but claimed that Sharp assured him that "it was a local issue and it was manageable and it was something that they could control."

## II.    DISCUSSION

The only issue the district court decided was whether or not Defendant Arch assumed a voluntary duty for the safety of Lone Mountain's employees, including Merrill. The district court initially denied summary judgment to Arch, finding that "[t]he record contains substantial evidence that Arch Coal voluntarily undertook to render services to Lone Mountain that would assist Lone Mountain with its obligation to provide a safe workplace for its employees." However, the court's later decision, which is the subject of this appeal, found that "there is no evidence that Lone Mountain ever delegated [to Arch] any part of its direct and primary duty to discover an correct unsafe conditions and, thus, protect its employees." Our task is to determine whether Plaintiffs

11

presented enough evidence that Arch voluntarily assumed a duty to Lone Mountain's employees to survive summary judgment.

### A. Standard of Review

We review the district court's grant of summary judgment *de novo*. *Smith v. Henderson*, 376 F.3d 529, 533. (6th Cir. 2004). Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). At the summary judgment stage, the Court's role is not to weigh the evidence and determine its truth, but rather to determine whether there are genuine issues for trial. *Sterling China Co. v. Glass, Molders, Pottery, Plastics & Allied Workers Local 24*, 357 F.3d 546, 551 (6th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). We "view all the facts and the inferences drawn therefrom in the light most favorable to the nonmoving party." *United Rentals (North America), Inc. v. Keizer*, 355 F.3d 399, 406 (6th Cir. 2004); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). However, the nonmoving party " must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538.

### B. Assumption of Duty

A parent corporation is not liable for the negligent acts of its subsidiaries under the doctrine of *respondeat superior*. *Thompson v. Superior Fireplace Co.*, 931 F.2d 372, 374 (6th Cir. 1991). However, "[i]t is ancient learning that one who assumes to act, even though gratuitously, may

thereby become subject to the duty of acting carefully, if he acts at all." *Glanzer v. Shepard*, 135 N.E. 275, 276 (N.Y. 1922) (Cardozo, J.); *accord Johnson v. Brey*, 438 S.W.2d 535, 536 (Ky. 1969) (noting longstanding view that "a duty voluntarily assumed cannot be carelessly abandoned without incurring liability resulting from abandonment"). Thus, a parent corporation "should be liable under customary principles of the common law for harm resulting from its own negligent or reckless conduct." *Boggs v. Blue Diamond Coal Co.*, 590 F.2d 655, 663 (6th Cir. 1979), *cert. denied*, 444 U.S. 836, 100 S. Ct. 71, 62, L. Ed. 2d 47 (1979). Neither the "rules of agency nor the workmen's compensation law insulate the parent from tort liability for its independent acts of negligence which cause injury to its subsidiary's employees." *Id.*

Because we have jurisdiction over this action due to the parties' diversity of citizenship, we must apply Kentucky substantive law. *See Erie Ry. Co. v. Tompkins*, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188 (1938). Kentucky courts have never ruled on the precise question of a parent corporation's duty to its subsidiary's employees, but this Court has held that if faced with the issue, the Kentucky Supreme Court would likely adopt the test set forth in Restatement (Second) of Torts § 324A, also known as the "Good Samaritan" doctrine. *See McGowan v. Cooper Indus., Inc.*, 863 F.2d 1266, 1270 (6th Cir. 1988) (citing *Raymer v. United States*, 660 F.2d 1136, 1142-43 (6th Cir. 1981)); *cf. Haddad v. Louisville Gas & Elec. Co.*, 449 S.W.2d 916 (Ky. 1969). Section 324A provides:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

13

(a) his failure to exercise reasonable care increases the risk of such harm, or

(b) he has undertaken to perform a duty owed by the other to the third person, or

(c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

RESTATEMENT (SECOND) OF TORTS § 324A (1965). In an action under § 324A, "[t]he threshold issue is typically whether the [defendant] undertook to render services . . . to the plaintiffs or for the benefit of plaintiffs." *Good v. Ohio Edison Co.*, 149 F.3d 413, 420 (6th Cir. 1998); *see also McAtee v. Fluor Constructors Int'l, Inc.*, 188 F.3d 508, 1999 WL 685928 at **6 (6th Cir. Aug. 27, 1999) (unpublished table decision) (citing *In re TMJ Implants Prod. Liab. Litig.*, 113 F.3d 1484, 1493 (8th Cir. 1997)) ("An actor's specific undertaking of the services allegedly performed without reasonable care is a threshold requirement to section 324A liability. The scope of this undertaking defines and limits an actor's duty under section 324A.").

Addressing the threshold duty issue, the district court found that there were no genuine issues of material fact remaining with respect to whether Arch assumed a duty for Merrill's safety. While we agree with the district court's conclusion that Arch's general corporate-wide safety program, safety awards and general safety guidelines are insufficient to create a duty on Arch's part, the record contains evidence of a more specific undertaking by Arch. Specifically, there is evidence that Arch management was aware of roof control problems at the Darby Fork Mine, and that Lone Mountain was considering various measures to make the roof safer. Furthermore, McCoy's actions went beyond mere oversight or consultation. McCoy visited the mine, went underground to look at the roof, and offered advice about roof control. He also admitted to concluding that Lone

14

Mountain's passive roof system was adequate, and that he expressed this conclusion to Darby Fork mine manager Frazier. We think that viewing these facts in the light most favorable to Plaintiffs, a reasonable trier of fact could find that McCoy voluntarily undertook to advise Lone Mountain on its specific roof control problems in the Darby Fork Mine, and that such an undertaking was for the benefit of miners like Merrill. Therefore, we find that summary judgment was inappropriate.

Because none of this Circuit's cases are directly on point, the district court relied on several cases from other jurisdictions to reach its conclusion that, as a matter of law, Arch did not assume a duty. The district court relied heavily on *Muniz v. National Can Corporation*, which held that "[n]either mere concern nor minimal contact about safety matters creates a duty to ensure a safe working environment for the employees of a subsidiary corporation." 737 F.2d 145, 148 (1st Cir. 1984). The *Muniz* court also found that in order to demonstrate that the parent assumed a duty, "plaintiff must establish either that the parent agreed to provide the service or that the parent intended to confer benefits . . . on the subsidiary." *Id.* at 149 (citing *Rick v. RLC Corp.*, 535 F. Supp. 39, 45 (E.D. Mich. 1981)). However, nothing in *Muniz* leads us to the conclusion that Arch did not assume a duty towards Lone Mountain or its employees. Unlike *Muniz*, where the parent corporation's only action was to provide a general safety guideline to be implemented by local management, this case involves more than "mere concern or minimal contact." McCoy's specific actions and advice regarding roof control went much further than the parent's actions in *Muniz*, and do not appear to have been rendered solely or primarily for Arch's own purposes. Rather, McCoy's

15

undertaking evidences an intention to confer benefits on Lone Mountain and its employees. Thus, the district court's reliance on *Muniz* was misplaced.[4]

We also find the situation here to be distinguishable from *Rick v. RLC Corp.*, cited by the First Circuit in *Muniz*. In *Rick*, the subsidiary paid the parent corporation to render various services, which included negotiating the subsidiary's insurance, reviewing accident reports and investigating selected accidents. 535 F. Supp. at 46. The court found that these activities were done solely for the parent's benefit: "[t]his conduct is consistent with the view that [the parent] was interested in the operations of [the subsidiary] from the perspective of a shareholder," or to "gather and provide information about itself and its subsidiaries." *Id.* There was no evidence in *Rick* that the parent "agreed or promised to provide these services to alert [the subsidiary] or its employees to safety hazards in the use or maintenance of their equipment." *Id.* at 47. By contrast, here there is evidence that McCoy provided assistance to Lone Mountain for the specific purpose of making its mines safer. Unlike the parent corporation in *Rick*, Arch did not merely compile statistics or information about itself and its subsidiaries. In addition, *Rick* is further distinguishable on the ground the parent in that case engaged in general safety monitoring activities, whereas here McCoy took actions specific to the roof control problem at the Darby Fork Mine.

---

[4]The district court also erroneously relied on *Fiscus v. Atlantic Richfield*, 773 P.2d 158 (Wyo. 1989) and *Hinkle v. Delavan Industries, Inc.*, 24 F. Supp. 2d 819 (W.D. Tenn. 1998). *Fiscus* is completely inapposite, as it rests totally on Wyoming law and does not even mention § 324A. *Hinkle* is factually very similar to *Muniz*; in that case the parent corporation's only action was to establish a safety task force to gather information on injuries for the purpose of reducing worker's compensation costs. *Hinkle*, 24 F. Supp. 2d at 822. The "main purpose of the task force was profit-related," and it was "not conducted as a service to the subsidiaries." *Id.* at 823.

We think this situation is most analogous to a case that the district court discounted, *Gaines v. Excel Industries, Inc.*, 667 F. Supp. 569 (M.D. Tenn. 1987), which held that summary judgment was inappropriate because there was evidence that the parent company-defendant undertook a duty for the safety of plaintiff, a subsidiary employee, under § 324A. In *Gaines*, a parent company employee reviewed the subsidiary's safety program and records, conducted safety audits, and participated in inspection tours of the subsidiary's plant. Similarly, Arch employees Hoops and McCoy reviewed Lone Mountain's safety program and records, and McCoy visited and toured the mine. McCoy also discussed and rendered specific advice relating to Lone Mountain's roof problems. Like Arch, the parent company in *Gaines* argued that the subsidiary's safety program "was administered entirely on a local basis" by the subsidiary, the parent "never undertook to manage the safety program, the subsidiary "did not require safety inspections by the parent," and the subsidiary alone was responsible for maintaining machinery in a safe manner. *Id.* at 572 (internal quotations omitted). We agree with *Gaines* that, notwithstanding these denials of responsibility, Plaintiffs have presented enough evidence to create a genuine issue of material fact over whether or not Arch voluntarily assumed a duty towards Lone Mountain and the safety of its employees.

Our ruling today is consistent with our prior unpublished decision in *McAtee*, *supra*, 1999 WL 685928. In that case, we failed to find an assumption of duty by a primary contractor for the safety of a subcontractor's employees. We indicated that in order to prevail, "[p]laintiff must present evidence that [defendant] specifically undertook to render safety services with respect to [p]laintiff's work" near the wire which caused the plaintiff's injuries. *Id.* at **6; *accord Johnson*

*v. Abbe Eng'g Co.*, 749 F.2d 1131, 1133 (5th Cir. 1984) (quoting *Patentas v. United States*, 687 F.2d 707, 716 (3d Cir. 1982)) (stating that parent corporation's duty to protect subsidiary's employees arises "when the defendant has 'undertaken to inspect the specific instrument causing the injury or to inspect the entire plant of which that instrument was a part'"). We also held that the contractor's holding of safety meetings and generally promoting safety were "insufficient to create a legal duty under § 324A." *McAtee*, 1999 WL 685928 at **8. Here, however, there is evidence that McCoy specifically undertook to render safety services with respect to the Darby Fork Mine's roof, the specific instrumentality which caused Merrill's death. Thus, summary judgment is also inappropriate under *McAtee*.

Finally, we note that in order to prevail in this action, Plaintiffs will have to demonstrate that Arch not only assumed a duty, but also (1) that Arch was negligent in carrying out that duty, and (2) that Arch's negligence proximately caused Merrill's death. *See Good, supra*, 149 F.3d at 420 (discussing liability under § 324A). Because the district court has not yet reached the questions of breach and causation, we decline to address those issues today. Thus, our decision is only that summary judgment was inappropriate on the threshold question of whether Arch voluntarily assumed a duty to assist Lone Mountain with its safety obligations, for the benefit of Lone Mountain and its employees.

### III. CONCLUSION

Viewing the record in the light most favorable to Plaintiffs, there is evidence creating a genuine issue of material fact on the question of whether Arch voluntarily assumed a duty to provide safety services to Lone Mountain, or for the safety of decedent Gary Merrill, a Lone Mountain

employee.  Therefore we **REVERSE** the district court's grant of summary judgment to Defendant

Arch and **REMAND** this case for further proceedings consistent with this opinion.

COOK, Circuit Judge, dissenting. The summary judgment record confirms that Lone Mountain did not delegate, and Arch did not usurp, any of Lone Mountain's employee-safety responsibilities. Neither Arch's efforts to foster safety awareness, nor safety director McCoy's informal exchanges of safety ideas with his Lone Mountain counterparts permit the conclusion that this parent assumed a duty to protect the safety of its subsidiary's employees.

Here, as in other cases where courts found no duty to a subsidiary's employees, responsibility for day-to-day safety concerns and final decisions on all safety-related matters were the subsidiary's alone. *See Muniz v. Nat'l Can Corp.*, 737 F.2d 145 (1st Cir. 1984); *Rick v. R.L.C. Corp.*, No. 82-1059, 1983 U.S. App. LEXIS 12283 (6th Cir. Dec. 7, 1983); *Hinkle v. Delavan Indus., Inc.*, 24 F. Supp. 2d 819, 822 (W.D. Tenn. 1998). And this case is distinguishable from *Gaines v. Excel Industries, Inc*., and the case upon which *Gaines* relied, *Patentas v. United States.* In those cases, a third party actively undertook responsibility for safety by inspecting the sites where the injuries occurred. *See Patentas,* 687 F.2d 707, 716 (3d Cir. 1982); *Gaines,* 667 F. Supp. 569, 572 n.3 (M.D. Tenn. 1987). Here, however, there is no evidence that McCoy inspected the part of the mine that collapsed. *See Evans v. Liberty Mut. Ins. Co.*, 398 F.2d 665, 667 (3d Cir. 1968) (insurer not liable because it had not inspected injury site and employer retained primary responsibility for safety).

Given the absence of evidence that Arch Coal undertook a duty that Lone Mountain owed its employees, the district court properly granted summary judgment to Arch Coal. I thus respectfully dissent.