James Ben RABAR and Judy
Rabar, Plaintiffs,

v.

E. I. duPONT de NEMOURS & CO., INC.,
a Delaware Corporation, Active Crane
Rentals, Inc., a Delaware Corporation,
trading as Active Rentals, Dennis An-
dreas, and William O. Seglettes, Defend-
ants.

Superior Court of Delaware,
New Castle County.

Submitted Sept. 20, 1979.

Decided May 28, 1980.

Robert Jacobs and Thomas C. Crumplar of Bader, Dorsey & Kreshtool, Wilmington, for plaintiffs.

Thomas Reed Hunt, Jr. of Morris, Nichols, Arsht & Tunnell, Wilmington, for defendant duPont.

Alfred M. Isaacs of Flanzer & Isaacs, Wilmington, for defendants Active Crane, Andreas and Seglettes.

LONGOBARDI, Judge.

The present action concerns a construction site accident which allegedly resulted in personal injuries to Plaintiff James Rabar and loss of consortium to his wife, Plaintiff Judy Rabar. For present purposes, it will be necessary to refer only to Plaintiff James Rabar's (hereinafter referred to as "Plaintiff" or "Rabar") claims and role in this controversy. Defendants include E. I. duPont de Nemours & Co. ("duPont") and Active Crane Rentals, Inc. and two of its employees (collectively referred to as "Active Crane"). Active Crane and duPont have cross-claimed against each other. Plaintiff has moved for partial summary judgment against duPont on the issue of liability. Defendant duPont has moved for summary judgment dismissing Plaintiff's complaint and Active Crane's cross-claim. Defendant Active Crane has moved for summary judgment on the basis that duPont was negligent and that Plaintiff was contributorily negligent.

I

The pertinent undisputed facts may be briefly stated. Defendant duPont, desirous of expanding the facilities at its Edgemoor plant, entered a cost-plus-percentage-of-cost contract with a joint venture firm, Healy-DiSabatino, for performance of the necessary construction. Plaintiff Rabar was employed by Healy-DiSabatino as an ironworker. One aspect of the project involved constructing a large pipe rack using vertical steel columns and horizontal steel beams. The columns were thirty-two and one half feet in height and were placed in poured concrete foundations four and three-quarter feet deep. Ideally, when two columns had been secured in place, each of two steel cross beams would be individually raised by a crane into place between the columns at heights of twenty-one and one-half feet and twenty-five feet and then permanently connected to the columns by ironworkers. Active Crane was under contract to duPont to perform the beam-raising function.

On the day of the accident, March 9, 1974, Plaintiff was engaged in making the necessary connections. At the time of the accident, Active Crane had raised a beam into place between two columns. Plaintiff and a co-worker had been using a fifteen foot ladder to climb up to the connection point. However, Plaintiff and his co-worker determined that the terrain at the base of the column had sloped off to such an extent

that the ladder they had been using was too short. Therefore, the two men climbed onto a cooling tower immediately adjacent to the column planning to cross over to the column and slide down to the connection point. Plaintiff's co-worker first slid down the column and attempted to make the connection but was unsuccessful; he then climbed back onto the cooling tower. Plaintiff then slid down the column to the connection point. Plaintiff first moved the beam, which was secured only by a crane line at the middle, into alignment with the column and temporarily secured the beam to the column using tools referred to as spud wrenches. Plaintiff next climbed from the column onto the beam intending to replace the spud wrenches with permanent nut-and-bolt connections. Before the permanent connections could be made, the end of the beam on which Plaintiff was seated moved causing the spud wrenches to fall out. At this precise moment, the beam was again secured only by the crane line at the middle; consequently, Plaintiff's weight at the one end caused the beam to dip downward. Plaintiff fell to the ground and was seriously injured. Although safety equipment designed to avoid this type of accident was available at the construction site, none was in use on this portion of the job at the time of the accident.

## II

Plaintiff's motion seeks a ruling that duPont is liable under the doctrine of negligence *per se* for alleged violations of certain occupational safety regulations promulgated by the Delaware Department of Labor ("Department") pursuant to 19 *Del.C.* 106(a). Defendant duPont contends that it cannot be held liable for negligence *per se* because it was not responsible for implementing the safety regulations at the construction site. Alternatively, duPont argues that even if it was responsible for implementing the safety regulations, the regulations relied upon by Plaintiff were not applicable in this case. As a third alternative, duPont claims it cannot be held liable because the accident resulted from Plaintiff's contributory negligence, negli-

gence of Healy-DiSabatino, or both. Defendant Active Crane's motion relies upon Plaintiff's argument that duPont was guilty of negligence *per se* and relies upon duPont's argument that Plaintiff was contributorily negligent.

## III

■ Before proceeding to the merits of these various motions, it is necessary to briefly review some background concerning the safety regulations adopted here in Delaware. As indicated above, these regulations were promulgated pursuant to 19 *Del.C.* 106(a) which provides as follows:

The Department may make, modify and repeal rules for the prevention of accidents or of industrial or occupational diseases in every employment or place of employment or such rules for the construction, repair and maintenance of places of employment as shall render them safe. Such rules when made shall have the force and effect of law and shall be enforced in the same manner as this chapter.

Rather than promulgate an entirely new set of regulations for this State, the Delaware Secretary of Labor simply adopted by reference the federal safety and health regulations contained in Part 1926 of Title 29 of the *Code of Federal Regulations.* Consequently, although these regulations were originally promulgated by the United States Secretary of Labor under the federal Occupational Safety and Health Act, 29 *U.S.C.* § 651 *et seq.*, their adoption in this State pursuant to 19 *Del.C.* 106(a) has transformed them into Delaware law. Therefore, the construction and interpretation to be given the pertinent regulations in this case must be decided as a matter of State law and federal cases delineating the scope and application of the federal regulations are not binding on this Court in determining similar matters under the State's regulations. Moreover, while such federal cases may in some instances be persuasive, those federal cases which have sought to construe the federal regulations by reference to the particular provisions found in

the federal Occupational Safety and Health Act provide little assistance to this Court which must primarily rely upon the Delaware statutory language and relevant case law for guidance. *Cf. Horn v. C. L. Osborn Contracting Co.*, 5th Cir., 591 F.2d 318, 321–22 (1979).

## IV

The two regulatory provisions upon which Plaintiff relies are set out below:

§ 1926.105. Safety nets.

(a) Safety nets shall be provided when workplaces are more than 25 feet above the ground or water surface, or other surfaces where the use of ladders, scaffolds, catch platforms, temporary floors, safety lines, or safety belts is impractical.

§ 1926.750. Flooring requirements.

\*　\*　\*　\*　\*　\*

(b) Temporary flooring—skeleton steel construction in tiered buildings.

(1) \* \* \*

(ii) On buildings or structures not adaptable to temporary floors, and where scaffolds are not used, safety nets shall be installed and maintained whenever the potential fall distance exceeds two stories or 25 feet. The nets shall be hung with sufficient clearance to prevent contacts with the surface of structures below. 29 *C.F.R.* Part 1926.

Defendant duPont agrees with Plaintiff in principle that these regulations may provide the basis for application of the negligence *per se* doctrine. However, duPont correctly contends that the doctrine cannot apply unless the Court determines that du-Pont was required by law to conform to the regulatory standards. *See Schwartzman v. Weiner*, Del.Super., 319 A.2d 48, 55 (1974).

Defendant duPont argues on two bases that it owed no duty to conform to the regulatory standards cited by Plaintiff. DuPont relies exclusively on federal cases holding that the federal safety provisions, statutory and regulatory: (1) provide no basis for a private cause of action; and (2) impose no duties on one who is not the "immediate employer" of the injured worker. Without attempting to explain the complex dispute which has arisen among the federal courts as to the second holding, the Court notes that all of the cases relied upon by duPont were premised upon express provisions in the federal Occupational Safety and Health Act, which have no counterpart in the statute under which the Delaware regulations were promulgated. See 29 *U.S.C.* §§ 653(b)(4) and 654(a) as construed in: *Jeter v. St. Regis Paper Co.*, 5th Cir., 507 F.2d 973 (1975); *Horn v. C. L. Osborn Contracting Co.*, M.D.Ga., 423 F.Supp. 801 (1976), *rev'd*, 5th Cir., 591 F.2d 318 (1979); *Cochran v. International Harvester Co.*, W.D.Ky., 408 F.Supp. 598 (1975); *Hare v. Federal Compress and Warehouse Co.*, N.D.Miss., 359 F.Supp. 214 (1973). In short, the cases relied upon by duPont provide no assistance to this Court because, although the Delaware regulations involved are identical to the federal regulations, the Delaware statutory authority, 19 *Del.C.* 106(a), is completely distinguishable from the federal statutory authority and contains no language persuasively similar to that found in 29 *U.S.C.* §§ 653(b)(4) and 654(a). Finding no interpretive assistance in the federal cases, the Court will now turn to the express provisions of our own statute to determine the class of persons upon whom the Delaware statute and regulations impose a duty of obedience.

The Delaware statute provides for the promulgation of "rules for the prevention of accidents . . . in every employment or place of employment . . ." While not explicitly specifying who is to be responsible for implementing the Department's safety regulations or who is to be liable for violations thereof, the statute is clearly directed to the goal of making places of employment as safe as is reasonably possible for workers. The Court recognizes that normally the employer of workers who are affected by conditions in the place of employment will be in the best position to assure proper implementation of the Department's safety rules. Consequently, the Court holds that, as an initial matter, each employer is responsible for implementing the safety regulations in the

place or places of employment where its employees work and such employer will be liable for violations of the regulations where the safety of its employees is affected. In this regard, the test for determining upon whom implementation responsibility will devolve is the same test used to determine whether a particular person or entity is the "employer" of an affected worker. The four factors considered in determining whether an employer-employee relationship exists are: (1) who hired the employee; (2) who can discharge the employee; (3) who pays the employee's wages; and (4) who has the power to control the conduct of the employee in the particular job he is performing. *White v. Gulf Oil Corp.*, Del. Supr., 406 A.2d 48 (1979).

■ By holding that every employer is responsible for implementing the safety regulations in the place or places where its employees may be affected, the Court is not ruling that each employer is exclusively responsible therefor. While such will often be the case where there is but one possible employer involved, achievement of the statutory purposes will often necessitate joint or overlapping responsibility in situations where multiple employers have employees working in the same general area. The case at bar presents a classic multi-employer situation, *i. e.*, a large construction site where at any given time numerous independent contractor employers may have several hundred or thousand employees working in overlapping areas. In order to assure that such workers will be provided a reasonably safe "place of employment," it is appropriate to require those who control the work area to also be responsible for safety regulation implementation, along with individual employers for the benefit of all workers in the area. While the individual employer is best able to ascertain the safety risks involved in the work of its own employees and to minimize such risks by its control over its employees, other employers who control the work area will best be able to eliminate safety hazards arising from the condition of the premises. Where several employers jointly control a definable work area, all such employers will be jointly responsible for safety regulation implementation in such area along with each individual employer whose employees work in that area. This rule, *i. e.*, that those who control the work areas are jointly responsible for safety implementation along with those who control the workers, will maximize the likelihood that the statutory objective of assuring reasonable safety "in every employment or place of employment" will be achieved in multi-employer situations.

The Court notes that the Department's construction site safety regulations appear to have adopted this approach in the contractor-subcontractor context. 29 *C.F.R.* § 1926.16 provides in pertinent part:

(b) By contracting for full performance of a contract . . . the prime contractor assumes all obligations prescribed as employer obligations under the standards contained in this part, whether or not he subcontracts any part of the work.

(c) To the extent that a subcontractor of any tier agrees to perform any part of the contract, he also assumes responsibility for complying with the standards in this part with respect to that part. Thus, the prime contractor assumes the entire responsibility under the contract and the subcontractor assumes responsibility with respect to his portion of the work. With respect to subcontracted work, the prime contractor and any subcontractor or subcontractors shall be deemed to have joint responsibility.

The Court approves this approach so far as it goes but notes that joint responsibility may also exist even in the absence of a contractor-subcontractor relationship, as where several general or specialty contractors are hired directly by a landowner under independent contracts to perform various aspects of a single construction project. The Court also notes that the work-area-control test adopted herein is consistent with the approach taken by some federal courts, *see Brennan v. OSHRC and Underhill*, 2d Cir., 513 F.2d 1032 (1975), and *Beatty Equipment Leasing v. Sec'y of Labor*, 9th Cir., 577 F.2d 534 (1978), and at least

three state courts. *See Funk v. General Motors Corp.*, Mich.Supr., 220 N.W.2d 641 (1974); *Bachner v. Rich*, Alaska Supr., 554 P.2d 430 (1976); *Kelley v. Howard S. Wright Construction Co.*, Wash.Supr., 582 P.2d 500 (1978).

■ As construed herein, therefore, the Delaware safety statute and regulations impose implementation responsibility on those who control the workers and those who control the work area. There is one additional method by which implementation responsibility may be imposed. This is the situation where one who otherwise has no direct responsibility under the statute and regulations voluntarily, by agreement or otherwise, undertakes responsibility for implementing the required safety measures. See, *e. g., Horn v. C. L. Osborn Contracting Co.*, above, in the Circuit Court. Because such measures are necessary for the protection of workers on the job site, failure by the assuming party to fully implement the regulations and to exercise due care in performing this obligation will render such party liable for injuries sustained by workers on account of inadequate or faulty performance of the assumed obligation. See *Restatement of Torts (Second)* § 324A (1965). Breach of this assumed duty will not, as a technical matter, render the breaching party liable for negligence *per se* since the safety statute and regulations will not apply to such party by their own force. Nevertheless, such breach will subject the breaching party to liability in simple negligence when a worker is injured as a proximate result of the breach.

### V

Having delineated the three possible bases upon which liability for failure to properly implement the safety regulations may be premised, the Court is now prepared to examine the role of duPont in the underlying controversy to determine if duPont may be held liable for alleged violations of the regulations. Only if this question is answered in the affirmative will it be necessary to ascertain whether the regulations may have actually been violated and, if so, whether or not summary judgment on the liability issue is appropriate at this time.

### A

■ On the basis of undisputed facts in the record, the Court is compelled to hold that duPont was not responsible for implementation of the regulations as Plaintiff's employer because duPont was not in fact Plaintiff's employer. Rather, all indicia of an employment relationship existed between Plaintiff and Healy-DiSabatino. Plaintiff was hired by Healy-DiSabatino and could be discharged only by Healy-DiSabatino. Healy-DiSabatino paid Plaintiff's wages. In this regard, the Court notes that all wages paid by Healy-DiSabatino to its workers were a reimbursable cost under the contract with duPont and duPont provided timekeeping and payroll services to Healy-DiSabatino. However, regardless of the arrangement between duPont and Healy-DiSabatino, Plaintiff's right to payment of wages was directly enforceable against Healy-DiSabatino not duPont. Plaintiff has been paid workmen's compensation benefits by Healy-DiSabatino's insurer. Again, the simple fact that duPont actually paid for Healy DiSabatino's workmen's compensation coverage under the contract may be relevant evidence on the question of who was Plaintiff's employer but in this case it is not conclusive of it. Lastly, while there is some question as to whether Defendant Active Crane, in addition to Healy-DiSabatino, might have been exercising some control over Plaintiff's conduct at the time of the accident (a question which need not be resolved in the context of the pending motions), the Court is satisfied that duPont did not have the power to control Plaintiff in the performance of the connection task which led to his accident.

The fact that duPont retained the power to have its engineers inspect the job site in order to enforce the contract terms did not transform duPont into Plaintiff's employer. DuPont's role in connection with the work as performed at Plaintiff's level consisted primarily of its right to terminate the contract if Healy-DiSabatino's workers failed

to adhere to the contract terms and specifications. DuPont may also have controlled the overall project to some extent through Healy-DiSabatino's general supervisor on the job, John Hogan, a longtime duPont employee who was transferred to the Healy-DiSabatino payroll for the duration of the Edgemoor construction project. This situation will be discussed in more detail *infra* but, for present purposes, it is sufficient to note that Hogan's job was to generally oversee the entire project and he did not have any direct control over the conduct of the several hundred Healy-DiSabatino workers in the performance of their specific, day-to-day jobs. Nor were Hogan or any of the duPont engineers directly involved in any way with controlling Plaintiff's conduct on the day of the accident; these people were not even in the area of the accident when it occurred. Consequently, even assuming that for some purposes Hogan was actually duPont's employee or agent while on the Healy-DiSabatino payroll, the Court concludes that duPont simply had not retained a sufficient quantum of control over the Plaintiff's conduct in the performance of his job at the time of the accident to render it Plaintiff's employer. Therefore, duPont was not responsible on this basis for implementing the applicable safety regulations.[1]

### B

Unlike the employer issue where the record will support but one conclusion, the Court believes the record may reasonably support either of two conclusions on the work-area-control issue. The question of duPont's responsibility for safety regulation implementation has come before the Court on cross-motions for summary judgment. Therefore, the record must be read in a light most favorable to each of the non-moving parties respectively. *See Bailey v.*

*Pennington*, Del.Supr., 406 A.2d 44 (1979). If the record thus read will support the opposite conclusions that duPont either did or did not retain sufficient control over the work premises to render it responsible for safety regulation implementation, then summary judgment on this issue must be denied to both duPont and Plaintiff. The Court finds that the record will reasonably support either of these conclusions.

■ Initially, it is important to note that at least superficially duPont's role in this controversy was that of a landowner and Healy-DiSabatino, Plaintiff's employer, was an independent contractor. The general rule of law is sometimes stated to be that a landowner is not liable for the torts of an independent contractor hired by the owner[2] unless the owner retains the power to control the methods and manner of doing the work. *Williams v. Cantera*, Del.Super., 274 A.2d 698 (1971); *see also Restatement of Agency (Second)* §§ 219(1), 220 (1958). However, even if the control exercised by the owner over the entire project is insufficient to render it liable under this test, the owner may still be liable to some extent if it retained sufficient control over part of the work or if it retained possessory control over the work premises during the work. *Restatement of Torts (Second), supra,* §§ 414, 422(a). The Court states these rules simply to point out that the work-area-control test announced herein for determining possible safety regulation implementation responsibility is, *vis-à-vis* landowners, consistent with general common law principles and does not present a radical departure from those rules.

■ From Plaintiff's viewpoint, the record will support (but does not compel) a finding that duPont had retained sufficient control generally over the construction project and the premises where the work

---

1. The Court notes that a contrary finding, *i. e.,* that duPont was in fact Plaintiff's employer, would produce an interesting result. While duPont might thereby be rendered liable for civil or criminal penalties for failure to properly implement the safety regulations, see 19 *Del.C.* 116, it would also be immune from common law tort liability under the Delaware Workmen's Compensation Act. See 19 *Del.C.* 2304.

2. It has also been said that "[t]his rule is distinguished by the variety of its exceptions." *Funk v. General Motors Corp.*, above, 220 N.W.2d at 644–45.

was done to render it jointly responsible with the individual contractor-employers for safety regulation implementation at the Edgemoor site.

In the usual situation, the landowner will relinquish control of the premises to a general contractor with instructions as to the final result desired. Once the contract work has been completed, control of the premises reverts back to the owner. In the instant case, although duPont was undeniably the owner, the record will support the conclusion that, as a practical matter, duPont had also actually assumed the role of general contractor for many significant purposes on the Edgemoor project. Specifically, the trier of fact could reasonably make the following findings based on the present record:

DuPont's activities were not limited to the relatively passive task of inspection of the work for compliance with contract specifications. Through approximately eight of its engineers at the job site, duPont coordinated and scheduled all phases of the project. DuPont directed where and when various aspects of the work would be done and the number of workers to be used on these jobs. The contract provided that du-Pont would designate the areas on the job site to which Healy-DiSabatino's employees could have access. Healy-DiSabatino's employees were required to follow duPont's badging and sign-in procedures at the construction site and duPont prohibited the use of vehicles owned by Healy-DiSabatino or its employees on the site unless specifically required in the contract. DuPont supplied all construction materials, special tools and equipment and prepared construction site facilities, i. e., shops, tool rooms, offices, for Healy-DiSabatino. Healy-DiSabatino was prohibited under the contract from subcontracting any part of the work without du-Pont's prior written approval. DuPont itself directly contracted out most specialty work, e. g., plumbing, sheet metal, painting, electrical, insulation and masonry, which normally would have been subcontracted out by the prime or general contractor. DuPont actually named one of its own employees, John Hogan, to serve as Healy-Di-Sabatino's general supervisor on the Edgemoor project. There is some evidence tending to show that on most matters other than union jurisdictional issues Hogan took his directions from duPont not Healy-DiSabatino, his nominal employer. Lastly, du-Pont's right to terminate the contract was not limited to situations involving Healy-DiSabatino's non-compliance; rather, du-Pont could "terminate the contract at any time for its own convenience." Defendant duPont's Answering Brief, Exhibit A, Section 13(b).[3]

In short, the contract here involved was not for the construction of a specified facility and Healy-DiSabatino was not in any practical sense the general or prime contractor on the job. For the most part, Healy-DiSabatino was only required to furnish general labor and supervision thereof on the project. Most other general contractor responsibilities at the overall managerial level were retained by duPont. Therefore, although duPont did not retain any direct control over most of the individual workers, including Plaintiff, in the manner of performance of their day-to-day jobs, a jury could reasonably find that duPont had retained sufficient control generally over the project and the job site to render it jointly responsible, along with the various contractor-employers, for proper safety regulation implementation. Put another way, if a jury were to find that duPont had assumed a dominant role for safety at the Edgemoor construction project, duPont could be held responsible for failure to properly implement the applicable safety regulations. *See Funk v. General Motors Corp.*, above, 220 N.W.2d at 648. Consequently, duPont is not entitled to summary judgment on the issue of its potential legal responsibility for implementation of the regulations.

**3.** The factors listed in this paragraph are those of relevance which appear in the present record. Prior to trial of the merits in this case other relevant circumstances on the issue of work-area control may be developed, e. g., who controlled security at the job site, evidence of which will, of course, be admissible.

However, the above analysis does not mean that Plaintiff is entitled to summary judgment on this issue. The Court finds that, reading the record in a light most favorable to duPont, a jury could also reasonably conclude that duPont did not retain sufficient control over the project or job site to make it responsible for safety regulation implementation. For example, by way of contrast to the facts as stated from Plaintiff's viewpoint, a jury could find that the general project supervisor, Hogan, was primarily directed by Healy-DiSabatino rather than duPont. A jury could also find that duPont's actual involvement at the job site was largely limited to inspection for compliance by the contractors. And while the present record is silent on the question, it may be developed at trial that duPont had completely relinquished control over the area where the pipe rack was being built (and where Plaintiff was injured) to the contractors. These are just a sampling of various material facts which may reasonably be found for either duPont or Plaintiff at the trial on the merits. Because reasonable disputes exist as to such material facts, the Court must also deny summary judgment to Plaintiff on the issue of duPont's potential legal responsibility for safety regulation implementation.

### C

On the question of duPont's potential safety regulation implementation responsibility, there is one final issue upon which the Court finds it appropriate to comment at this time in the interest of judicial economy and to provide the parties with some guidance as to the conduct of further pretrial matters.

 Although Plaintiff's present motion is limited to negligence *per se* issues, the Court notes that the complaint states a claim against duPont on the basis that it voluntarily assumed responsibility for safety at the Edgemoor site. As indicated in

Section IV, *supra*, voluntary assumption of safety responsibilities may render the assuming party liable in tort if the assumed duty is not properly performed. *Restatement of Torts (Second), supra*, § 324A. Record facts tending to show such voluntary assumption by duPont include: (1) duPont assigned its own safety engineer to oversee safety aspects of the construction; (2) duPont's safety engineer held weekly safety meetings with the contractor's supervisors and he also apparently investigated Plaintiff's accident and compiled a report thereon containing recommendations for avoidance of similar problems in the future; (3) duPont supplied all necessary safety equipment at the job site and may also have provided first aid facilities for the contractors' employees. On the other side of the scale, the instant contract expressly provided that Healy-DiSabatino would be responsible for all safety regulation compliance.[4] On these facts, the Court finds that the voluntary assumption of safety responsibility issue must be reserved for the ultimate trier of fact.

### VI

Having determined that the record presents a triable issue of fact concerning duPont's responsibility for implementing the safety net regulations, 29 *C.F.R.* §§ 1926.105(a) and 1926.750(b)(1)(ii), it is now appropriate to consider duPont's contention that in any event these regulations were not in fact violated at the Edgemoor site in the area where Plaintiff was injured. If the evidence will support a finding that the regulations were violated, the Court holds that the question of whether such violations were a proximate cause of Plaintiff's injuries will be reserved for the trier of fact. *See Ebersole v. Lowengrub*, Del. Supr., 180 A.2d 467, 469 (1962).

 DuPont asserts that neither of the cited provisions were applicable by their express terms to the job Plaintiff was per-

---

4. If a jury were to find that duPont had retained sufficient control over the job site to render it responsible for safety regulation implementation, this contract provision will not absolve duPont of its non-delegable duty under the regulations. *See* Restatement of Torts (Second), *supra*, § 424.

forming at the time of his injury. First, as to both regulations, duPont essentially argues that they apply only where the actual fall distance of the injured worker exceeds twenty-five feet and Plaintiff allegedly fell a distance of twenty-one and a half feet to twenty-three feet at most. The question of Plaintiff's actual fall distance, to the extent it is relevant, is disputed by the parties and must therefore be reserved for trial. Section 1926.105(a) applies where "workplaces are more than 25 feet above the ground . . .." Section 1926.750(b)(1)(ii) applies where "the potential fall distance exceeds . . . 25 feet." On the basis of this language, the Court holds that the proper test of applicability is the potential fall distance and that if the trier of fact finds that Plaintiff, in the course of the task he was performing which led to his injuries, was required to work at a height greater than twenty-five feet, the trier of fact may also conclude that the regulations were applicable.

Secondly, as to § 1926.105(a), duPont notes that safety nets are to be provided only if use of other safety devices is "impractical." DuPont then argues that it would have been "practical" for Plaintiff to use a ladder of appropriate length, such ladders being generally available at the job site, to climb up to the connection point; consequently, use of a safety net was not required. Although the regulation could have been more artfully drawn, the Court concludes that the regulation clearly requires that alternative practical safety devices must actually be used in order to avoid the necessity of providing safety nets. Acceptance of duPont's "practicality" defense would render the regulation totally meaningless since no nets or other safety devices would be required so long as the use of any safety device was theoretically "practical." See *Kelley v. Howard S. Wright Construction Co.*, above, and *Brennan v. Southern Contractors Service*, 5th Cir., 492 F.2d 498 (1974). The Court declines to place such an unreasonable construction on the regulation.

Lastly, as to § 1926.750(b)(1)(ii), duPont points out that the regulation applies only to work on "tiered" structures and argues that the pipe rack from which Plaintiff fell "obviously was not" tiered. The Court holds that the issue of whether the pipe rack was a tiered structure is, on the present record, a disputed material fact which must be reserved for trial.

## VII

The final issues presented by the pending motions concern the possible contributory negligence of Plaintiff and negligence of Healy-DiSabatino. DuPont asserts that on the record, this Court must conclude as a matter of law that Plaintiff was contributorily negligent in the performance of the connection task and that such negligence was proximately related to Plaintiff's accident. The Court has carefully reviewed the portions of the record concerning the manner in which Plaintiff was performing his work and holds that the question of contributory negligence must be reserved for the trier of fact.

Plaintiff argues that because the safety statute and regulations which were allegedly violated in this case were enacted *inter alia* for the purpose of preventing worker injury even when the worker may have been contributorily negligent, the Court should abrogate application of the defense in this context. The contributory negligence doctrine has always been a part of the law of Delaware and any change in this rule must find its origin in the Legislature. *See McGraw v. Corrin*, Del.Supr., 303 A.2d 641, 644 (1973). Moreover, the Court notes that some courts have recognized the applicability of the doctrine in the context of construction site safety regulations. *E. g., Bachner v. Rich*, above.

DuPont has also raised the issue of Healy-DiSabatino's possible negligence in supervising the job on which Plaintiff was injured. Because Healy-DiSabatino is not a party to this action, the question of its possible negligence is relevant only to the issue of the extent to which its negligence, as compared to the possible negligence of

the various parties, was the proximate cause of Plaintiff's injuries. The present record is not conclusive on the question and, therefore, this issue must also be reserved for trial.

### VIII

Based upon the foregoing analysis, the Court finds that the various motions for summary judgment must be and hereby are denied.

IT IS SO ORDERED.