**Richard M. PATTON, individually and as Administrator of the Estate of Edward R. Patton, deceased, Plaintiff,**

v.

**Anthony E. SIMONE, Richard L. Ventresca, Paul Ignudo, Lawrence Carson, Keystone Elevator Company, Continental Insurance Company, Equifax Services, Inc., Beneficial National Bank, Michael A. DiEleuterio, White and White Inspection and Audit Service, Inc., Defendants.**

**Anthony E. SIMONE, Third–Party Plaintiff,**

v.

**DIAMOND CHEMICAL AND SUPPLY CO., Third–Party Defendant.**

Superior Court of Delaware,
New Castle County.

Submitted: Sept. 22, 1992.
Decided: Dec. 8, 1992.

**3.** At least if they do, the history of those institutions or facilities is not part of and is not decided in this case.

Edmund D. Lyons, Jr., of Aerenson, Ferrara & Lyons, for plaintiff.

Henry E. Gallagher, Jr., of Connolly, Bove, Lodge & Hutz, for defendants Equifax Services, Inc. and White and White Inspection and Audit Service, Inc.

## OPINION

HERLIHY, Judge.

Defendants Equifax Services, Inc. [Equifax] and White and White Inspection and Audit Service, Inc. [White and White] have moved for summary judgment. Equifax acquired White and White, therefore, when reference is made to both companies, Equifax will be used.

## FACTS

Edward R. Patton [Patton] worked for Diamond Chemical and Supply Company [Diamond Chemical], a wholesale janitorial supply business at Second and Market Streets in Wilmington, Delaware. He had worked at that location for approximately eighteen months prior to the date in question. While at work on October 19, 1989, Patton fell down an open elevator shaft and died later that day as a result of injuries sustained in the fall.

Diamond Chemical was purchased by Richard A. Ventresca [Ventresca] and Anthony E. Simone [Simone] as partners in 1975. Ventresca owned seventy percent of Diamond Chemical and Simone owned the remaining thirty percent. Ventresca and Simone purchased the building in which Diamond Chemical was located by the end of 1978. At that time, there was and continued to be only one elevator in the build-

ing. The building is five stories tall and over one hundred years old. Prior to the date the building was purchased by the partnership, a worker by the name of Joseph Lilly fell down the unprotected elevator shaft on August 23, 1974.

The City of Wilmington Department of Licenses and Inspection [L & I] wrote Ventresca on November 4, 1975 in regard to an inspection of the building the previous day. At that time, Ventresca was informed that the elevator was in serious violation of the *Wilmington City Code [Code]*. He was told to bring the elevator up to *Code* requirements within thirty days. L & I never reinspected the location to see if the required repairs were performed. On May 26, 1977 the building was inspected by the Wilmington Fire Department. In a letter dated June 3, 1977, the Fire Department notified Michael A. DiEleuterio [DiEleuterio], then Deputy Commissioner of L & I, that the building contained structural defects which could possibly constitute *Code* violations.

Ventresca and Simone dissolved their partnership by written agreement on November 11, 1980. The dissolution was not amicable. The dissolution agreement [agreement] provided, in part, that the land and building on which Diamond Chemical was operating was to be transferred to Ventresca and Simone as tenants in common. The agreement continued that neither was to seek a partition of the property and each was granted a right of first refusal with respect to the other's undivided interest in the property.

The Fire Department again inspected the building in February 1985. Ventresca was sent a notice that there were *Code* violations within the building. On November 29, 1985 a worker, James Turner, fell down the elevator shaft and was seriously injured. The Fire Department returned to inspect the building in December 1986. It noted that the elevator shaft was still unprotected. On January 28, 1987 Roland Hewett [Hewett], another employee, fell down the shaft.

When the Fire Department returned in July 1988, Ventresca was granted a one-year grace period before the elevator needed to meet *Code* requirements because Ventresca stated that Diamond Chemical was to be moved to another location during that time period. In August 1989, the Fire Department again contacted Ventresca following an inspection in July. On finding that none of the repairs were completed, Ventresca was given thirty days to make the corrections, including enclosing the elevator shaft. None of the repairs to the elevator were completed before October 18, 1989, the date Patton fell down the elevator shaft.

On the date in question, Patton and Hewett both were working at Diamond Chemical. Patton was on the fifth floor and Hewett was at street level where he was unloading a truck. Hewett called the elevator in order to retrieve a pallet jack on the fifth floor. While he was on the third floor, Hewett realized that he had not replaced a chain that went across the elevator shaft opening on the fifth floor. He called to Patton to inform his co-worker of his lapse. According to Hewett's deposition, Patton replied acknowledging the open shaft. Hewett soon heard a loud bang from the elevator shaft and upon investigating, found that Patton had fallen down the shaft. Hewett did not see Patton fall.

Equifax became involved when three underwriting surveys of the property were conducted in August 1985, October 1986 and October 1988. On August 20, 1985, White and White conducted an "Owner, Landlord and Tenant Survey" for Diamond Chemical's liability and worker's compensation insurer (not Continental Insurance Company [Continental]). White and White was asked to provide three photographs of the building and to measure square footage. It was also asked to describe all Diamond Chemical's business operations and employee's duties. The inspector found the elevator to be in good condition.

In the fall of 1986 after Turner's fall, Diamond Chemical's worker's compensation insurer (again, not Continental) asked Equifax to check the officers and their duties and under which classification they

belonged in connection with the worker's compensation survey requested. The October 24, 1986 inspection report stated that the building was structurally safe and sound and appeared to be in good condition. The report said that for worker's compensation purposes, Diamond Chemical was a good risk.

On October 10, 1988, Equifax conducted a general liability survey and inspected the building after being so commissioned by Continental in conjunction with Diamond Chemical's on-going loss control program. In his deposition, Equifax's representative asserted the loss control survey was a limited evaluation of an insured's property for the purpose of providing the insurer with information concerning the insured risk to aid the underwriter in setting the premium and to make recommendations to the insured in order to help reduce the risk of loss to the insurer. He added that the survey was not an inspection, that it looked at areas where the public, having access, might be injured. He concluded by stating that the survey was conducted to help develop recommendations to avoid injuries.

On November 3, 1988, Continental wrote to Ventresca acknowledging Equifax's inspection "recommending" two improvements. One was that the Fire Department exterior sprinkler connections be properly maintained and the other was that an overhead light to the ceiling in the retail showroom be properly secured. Nothing was said about the elevator. Ventresca sent a letter dated December 16, 1988 to Continental which stated "both items on your November 3, 1988, letter of recommendations have been corrected and are now in compliance with our on-going loss control program."

In none of the three inspections did any of Equifax's personnel note any problems about the elevator or make any recommendations with regard to it.

### STANDARD OF REVIEW

■ In order for a party to be entitled to summary judgment, that party has the burden of showing there is no genuine issue of material fact and he or she is entitled to

judgment as a matter of law. *Moore v. Sizemore*, Del.Supr., 405 A.2d 679, 680 (1979). After reviewing the record in a light most favorable to the non-moving party, *Oliver B. Cannon & Sons, Inc. v. Dorr–Oliver, Inc.*, Del.Super., 312 A.2d 322, 325 (1973), the motion for summary judgment will be denied if the Court finds any genuine issues of material fact. *Pullman, Inc. v. Phoenix Steel Corp.*, Del.Super., 304 A.2d 334, 335 (1973).

### CLAIMS

Equifax asks that its motion for summary judgment be granted as the underwriting surveys performed did not create a legally enforceable duty to Patton. It also claims that there was no uninterrupted casual connection between the inspections and Patton's fall. Equifax states that it was not in possession or control of the property and, thus, it cannot be held liable for perpetuating a nuisance. Equifax also asserts that plaintiff Richard M. Patton's [plaintiff] claim is barred because Patton assumed the risk inherent in working near the open elevator shaft.

Plaintiff, the father of Patton and executor of his estate, claims that Equifax's motion for summary judgment should be denied as (1) Equifax had a duty running to third parties to inspect the Diamond Chemical site with due care and to recommend correction of any dangerous condition likely to result in physical injuries, (2) Equifax's negligence was among the several proximate causes of Patton's death, (3) Equifax's liability was not cut off by any superseding cause, (4) Equifax is not able to use the defense of Patton's assumption of the risk as it is subsumed within the defense of comparative negligence and is a factual matter to be determined by the jury and (5) Equifax can be deemed liable for perpetuating a nuisance.

### LIABILITY UNDER RESTATEMENT (SECOND) OF TORTS § 324A

■ Both parties argue that *Restatement (Second) of Torts* § 324A (1965) supports their contentions.

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

(a) his failure to exercise reasonable care increases the risk of such harm, or

(b) he has undertaken to perform a duty owned by the other to the third person, or

(c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

*Restatement (Second) of Torts* § 324A.

The Delaware Supreme Court has not expressly adopted § 324A, however, it has referred to it in considering potential liability. *Furek v. University of Delaware*, Del. Supr., 594 A.2d 506, 515–516, 520 (1991). Section 324A also has been used by this Court to analyze liability. *Rabar v. E.I. duPont de Nemours & Co.*, Del.Super., 415 A.2d 499, 505 (1980); *Mergenthaler v. Asbestos Corp. of America, Inc., et al.*, Del.Super., C.A. Nos. 81C–FE–27, et al., Taylor, J., 1989 WL 48601 (April 28, 1989); *Furek v. University of Delaware*, Del.Super., C.A. No. 82C–SE–30, Poppiti, J., 1987 WL 18118 (December 23, 1987); *Patton v. Simone*, Del.Super., C.A. Nos. 90C–JA–29, 90C–JL–219 (consolidated), Herlihy, J., 1992 WL 183064 (June 25, 1992). Section 324A has also formed an analytical framework in the United States District Court in applying Delaware law. *Hassan v. Hartford Insurance Group*, D.Del., 373 F.Supp. 1385 (1974); *Ricci v. Quality Bakers of Amer-*ica Cooperative Inc., D.Del. 556 F.Supp. 716 (1983).

Accordingly, it is appropriate to utilize § 324A in weighing Equifax's potential liability to plaintiff. This Court formally adopts it as Delaware law.

### Performance of an Undertaking

■ "The threshold requirement for the application of section 324A is whether the defendant *undertook*, gratuitously or for consideration, to render services to another." [Emphasis in original.] *Deines v. Vermeer Mfg. Co.*, D.Kan., 752 F.Supp. 989, 994 (1990). The record does not support the contention that there was an undertaking by Equifax. The plaintiff must show more than an inspection and loss prevention. *Smith II v. Allendale Mut. Ins. Co.*, Mich.Supr., 410 Mich. 685, 303 N.W.2d 702, 712 (1981). It must be shown that the defendant, in this case Equifax, assumed an obligation or intended to render services for the benefit of another. *Id.* There is no evidence that Equifax's inspections involved either of these features. Compare *Mergenthaler, supra,* (insurer inspected plant, took air samples, provided safety and health services and caused diagnostic x-ray screening to be done).

Equifax undertook an apparent insurance risk assessment premium determination inspection [1] for various carriers.[2] The record does not show any indication that Equifax undertook any of its inspections for the benefit of Diamond Chemical or any of its employees, including Patton.

### Advertisements

■ Plaintiff argues, however, that various brochures or other material supplied by Continental [3] constitute an under-

---

1. The Court declines to accept Equifax's invitation to label its activities as surveys rather than inspections. While there might be a difference, such labeling is an intellectual trap. The Court will use "inspection" but that word connotes no outcome determinative signal.

2. It appears that one of Equifax's inspections was for a worker's compensation carrier, at least in part. As such, Equifax may be immune from liability. Cf. *Young v. O.A. Newton & Son Co.*, Del.Super., 477 A.2d 1071 (1984). As this proposition was not fully briefed and because this Court's decision uses different grounds, that issue need not be resolved herein.

3. We have the right but are not obligated to:
   1. Make inspections and surveys at any time;
   2. Give you reports on the conditions we find; and
   3. Recommend changes.
   Any inspections, surveys, reports or recommendation relate only to insurability and the premiums to be charged. We do not make

taking within the meaning of § 324A. In *Smith II*, the court stated that "if the insurer's advertising or communications with its policyholders represent that its inspection services will relieve the insured of the burden of monitoring its own facilities, it has undertaken to render inspection services for the benefit of the insured and is subject to liability if it fails to exercise reasonable care in performing that undertaking." *Id.*, 303 N.W.2d at 712.

Continental's advertisements here seem to state that the insurer would work with the policyholder to detect unsafe areas and to suggest solutions. The insurer did not supplant Diamond Chemical in its duty to make the workplace safe. The earlier edition of the brochure states that "[r]isk identification, evaluation, management—all tough jobs. CTEK[4] is on hand to help make these jobs easier for you". Continental did not say that it would do all the work. It merely stated that it would help. In another brochure, Continental stated that CTEK safety specialist review the business' operating procedures covering risk evaluation and risk improvement.

Unlike the facts in *Brown v. Michigan Millers Mut. Ins. Co., Inc.*, Mo.App., 665 S.W.2d 630, 634 (1983), the brochures are not the original proposal specifically directed towards Diamond Chemical. The insurance policy between Continental and Diamond Chemical did not provide for any inspections to be done. In fact, as stated in the applicable Continental brochure, Continental asserted that it had the right but not the obligation to inspect. In addition, it declared that any inspection was only to relate to insurability, not safety, or to see if the insured's premises met code requirements.

At most, even if this Court did consider that the brochures' offer of inspection services to be an undertaking, only the first

requirement of § 324A has been met. *Leroy v. Hartford Steam Boiler Inspec. and Ins. Co.*, D.Kan., 695 F.Supp. 1120, 1127 (1988). Equifax did not have anything to do with the publication and dissemination of the brochures. Thus, Equifax did not have an undertaking in relation with Diamond Chemical and Patton. It did not agree or intend to benefit Diamond Chemical or Patton. It agreed or intended only to benefit Continental. Equifax is not liable to Patton because of the publication of the brochures.

### Liability of Equifax Under 324A(a)

■ The crux of plaintiff's claim against Equifax is that its inspectors failed to find and warn Diamond Chemical and Patton of the defective elevator or to take or force corrective action. Simply put, and for purposes of this decision, the defect is that the elevator system was not equipped with doors or gates on each floor which would have to close before the elevator left that floor. For purposes of this decision, it is assumed that this situation was defective and/or violated applicable building and/or fire codes.

For Equifax to be liable under subsection (a), plaintiff must show that Equifax's activities somehow increased the risk of harm to Patton. *Evans v. Liberty Mutual Ins. Co.*, 398 F.2d 665, 667 (3rd Cir.1968); *Patentas v. United States*, 687 F.2d 707, 717 (3rd Cir.1982); *Hassan, supra,* at 1391; *Ricci, supra,* at 720; *Deines,* 752 F.Supp. at 994; *Restatement (Second) of Torts* § 324A, Comment C, Illustration 1.

■ There is nothing in the record to show that Equifax's failure to note and take any action about the elevator, assuming this was negligent, increased any harm to Patton or any other Diamond Chemical employees. An increased risk means some

---

safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety or workers or the public. And we do not warrant that conditions:
  1. Are safe or healthful; or
  2. Comply with laws, regulations, codes or standards.

This condition applies not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations. Continental Insurance Brochure covering applicable period in 1988.

**4.** Continental Technical Services.

physical change to the environment or material alteration of the circumstances. *Patentas,* 687 F.2d at 717. Equifax's inspections were visual only. No alterations or changes were made and the defective elevator system went on as before.

Therefore, Equifax cannot be held liable under § 324A(a).

### Liability of Equifax Under § 324A(b)

■ Plaintiff argues that by carrying out the three inspections, Equifax undertook to perform a duty owed by Diamond Chemical to Patton.

■ Diamond Chemical had the duty to provide a safe place in which Patton and his co-workers were to work. *Powell v. Interstate Vendaway, Inc.,* Del.Super., 300 A.2d 241, 244–45 (1972); *O'Neal's Bus Service, Inc. v. Employment Secur. Comm.,* Del.Super., 269 A.2d 247, 249 (1970).

■ "In order to prevail under section 324A(b), a plaintiff must establish that the one who undertook a duty to inspect supplanted and not merely supplemented another's duty to inspect." *Ricci,* 556 F.Supp. at 721. Here, as with subsection (a), the record is devoid of any facts which would show or create a genuine issue of material fact that Equifax assumed any part of Diamond Chemical's duty to provide a safe workplace.

The 1986 and 1988 Equifax reports contain language limiting the purposes of its inspections and reports. The record is uncontroverted that Equifax was hired to perform insurance risk and premium inspections for various carriers and this does not represent any kind of delegation by any such carrier or Diamond Chemical to assume any part of their duties (assuming *arguendo,* any carrier had such a duty). *Smith II,* 303 N.W.2d at 713. Compare *Deines,* 752 F.Supp. at 995–96 (employer had no engineer of its own, carrier provided frequent product safety inspections by its engineer, including compliance with applicable safety codes, safety design/various codes suggestions made); *Hempstead v. General Fire Extinguisher Corp.,* D.Del., 269 F.Supp. 109, 116–17 (1967) (defendant

Underwriters Laboratory, Inc. prescribed safety standards for fire extinguisher use, tested product to determine compliance prior to having its seal of approval affixed); *Nelson v. Union Wire Rope Corp.,* 31 Ill.2d 69, 199 N.E.2d 769, 776 (1964) (defendant gratuitously undertook safety engineering services and planned and directed safety inspections).

Instructive under the analysis of potential § 324A liability is the case of *Sheridan v. Aetna Casualty and Surety Co.,* 3 Wash.2d 423, 100 P.2d 1024 (1940). The plaintiff in that case was injured when he fell down an elevator shaft because the guard gate malfunctioned and was open. Aetna provided the owners with a general liability policy and inspected the premises quarterly, including the elevator in question. Aetna never found a defect. It sent copies of its letters to the City of Seattle because a city ordinance required a report and Aetna did the reporting for the owner. "[Aetna] agreed to perform, for the owner, the duty of inspecting the elevator and reporting its condition to the building department of the city." *Id.,* 100 P.2d at 1029.

Equifax did not undertake such responsibility for Diamond Chemical here. Their inspections were for insurability and premium setting. No correspondence was ever sent to the City. Diamond Chemical never requested an inspection, as required by the Code, *see, infra* at 854–855. Therefore, there was no undertaking and no supplanting of any of Diamond Chemical's duties.

### Liability of Equifax Under § 324A(c)

■ In order for Equifax to be liable under this section, there must be proof of actual reliance on a contractual undertaking or representations by the defendant that resulted in acts or omissions by the party relying on Equifax's undertaking. *Smith v. Universal Underwriters Ins. Co.,* 732 F.2d 129, 131 (11th Cir.1984). Reliance does not require a new or increased risk. *Mergenthaler, supra,* at 6.

The record shows that Equifax was hired not by Diamond Chemical but by the company's various carriers. It carried out

three inspections in four years. The record does not show that Diamond Chemical scaled down or eliminated its own inspection or safety program, or that it never set one up because of Equifax's inspections. While Ventresca knew of one or more of the inspections, there is no indication whatsoever that Patton knew of the inspections.

Equifax did notify Continental of two matters needing some attention as a result of its 1988 inspections, neither involved the elevator system. In turn, Continental notified Diamond Chemical of these items recommending remedial action. Corrective action was taken but this single letter does not demonstrate . that Diamond Chemical relied in any way upon Equifax's inspections to note problems.

In addition to reliance, plaintiff would have to show that Diamond Chemical's knowledge of Equifax's "undertaking" induced it "to forgo other remedies or precautions against such a risk." *Restatement (Second) of Torts* § 324A, Comment E; *Patentas*, 687 F.2d at 717. The record is devoid of any such inducement.

The record is replete with information that Diamond Chemical was fully aware as of October 10, 1988, the last inspection, of the defective condition of the elevator. There is nothing to indicate Diamond Chemical relied upon Equifax's inspection to solve the elevator deficiency. *Ricci*, 556 F.Supp. at 721.

### ASSUMPTION OF THE RISK

■ Equifax argues that Patton voluntarily assumed the risk of the open shaft when he continued to work in the area after Hewett moved the elevator to a different floor and called to Patton that the chain was no longer in place. Plaintiff counters that the determination as to whether Patton's assumption of the risk was primary or secondary is an issue of fact to be determined by the jury.

■ Assumption of the risk is a defense to negligence. *Staats by Staats v. Lawrence*, Del.Super., 576 A.2d 663, 668 (1990). The standard is subjective taking into consideration the insured's age, maturity, intelligence and experience. *Id.* Primary assumption of the risk exists when a person expressly relieves the other of all legal duty. *Bib v. Merlonghi*, Del.Supr., 252 A.2d 548, 550 (1969). In this situation, Patton did not expressly relieve Equifax or any of the other parties to the suit of all legal duty. Thus, the Court must consider whether Patton secondarily assumed the risk.

■ Secondary assumption of the risk comes about when a person makes "a deliberate and unreasonable choice to encounter a risk created by another's breach of duty." *Id.* Secondary assumption of the risk is "totally subsumed within comparative negligence".. *Koutoufaris v. Dick*, Del.Supr., 604 A.2d 390, 398 (1992). Delaware's comparative negligence statute is 10 *Del.C.* § 8132.[5] If Patton knew of the risk, appreciated its danger yet did not avoid it, the jury could find that he assumed the risk. If the jury holds Patton to have assumed the risk, there may be no recovery for his injuries. *Yankanwich v. Wharton*, Del. Supr., 460 A.2d 1326, 1330 (1983).

The risk involved in this case was the risk of falling down the open elevator shaft. As he had worked in the building for approximately eighteen months, Patton knew that the elevator shaft was without a door or gate. He acknowledged Hewett's call that the chain was not in place and, thus, at the time there was nothing to prevent entry into the shaft, whether the elevator was on the floor or not. There was the possibility he could fall five stories, a definite danger. "[T]here are some risks to which no adult will be believed if

5. In all actions brought to recover damages for negligence which results in death or injury to *person* or property, the fact that the plaintiff may have been contributorily negligent shall not bar a recovery by the plaintiff or his legal representative where such negligence was not greater than the negligence of the defendant or the combined negligence of all defendants against whom recovery is sought, but any damages awarded shall be diminished in proportion to the amount of negligence attributed to plaintiff.
10 *Del.C.* § 8132.

he says he did not understand them." *Staats*, 576 A.2d at 668.

Patton did make à deliberate choice to stay on the fifth floor and to drag the pallet backwards towards the open elevator shaft. There were reasonable alternatives available to him. Patton could have chosen to push the pallet towards the opening rather than pulling it. He could have recalled the elevator in addition to replacing the chain. It might have been possible to change to a different chore on that floor that did not involve going near the shaft. There was a breach of duty, but not by Equifax. "[A]ssumption of the risk, to a level greater than a defendant's primary negligence, may constitute proximate cause sufficient to bar recovery." *Koutoufaris*, 604 A.2d at 398 n. 6. The record to date indicates Patton assumed the risk of the open elevator shaft, however, his assumption was a secondary assumption of risk and its degree remains a jury question.

### PROXIMATE CAUSE

The Court will next consider whether Equifax's failure to find and report the *Code* violations was a proximate cause of Patton's fall. Equifax argues that its alleged negligence was not a proximate cause of Patton's fall because it was not a direct cause leading to a natural, continual and unbroken sequence leading to the injury. It also contends that any causal connection that might exist was broken by others' superseding negligence. Plaintiff claims that the issue of proximate cause is usually a question of fact submitted to the jury. *Culver v. Bennett*, Del. Supr., 588 A.2d 1094, 1098 (1991). He also states that if Ventresca had been informed of the elevator's condition by Equifax, the suggestions would have been followed as were the recommendations in the November 3, 1988 letter from Continental. In addition, he maintains that Equifax's negligence was not cut off by any superseding cause.

"[P]roximate cause is [defined in Delaware as] that direct cause without which the accident would not have occurred." *Chudnofsky v. Edwards*, Del.Supr., 208 A.2d 516, 518 (1965). It is also defined in terms of the "but for" rule; "that cause which in natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury and without which the result would not have occurred." *James v. Krause*, Del.Super., 75 A.2d 237, 241 (1950).

After Delaware adopted 10 *Del.C.* § 8132, its comparative negligence statute, the Supreme Court determined that the legislature did not intend to change the State's "common law determination of proximate cause with respect to either the defendant's negligence or the plaintiff's contributory negligence. Consequently, Delaware continues to adhere to its common law 'but for' rule of proximate cause." *Culver*, 588 A.2d at 1098. "Delaware has long recognized that there may be more than one proximate cause of an injury." *Id.* at 1097. The court also stated that "[i]n an action based on negligence, for a plaintiff to recover, it must be shown by a preponderance of the evidence that the defendant's negligence act or omission violated a duty which was owed to the plaintiff." *Id.* at 1096–97.

There was more than one proximate cause of Patton's fall. However, Equifax's failure to find and report or its "failure" to force or take corrective action the elevator's *Code* violations was not one. That failure was not in a natural and continuous sequence that produced the injury. Therefore, the failure does not pass the "but for" test. Equifax also did not have a duty to Patton. There is nothing in this record to show that Equifax's failure to find and report the elevator's condition violated a duty to Patton. The record would indicate that Patton was contributorily negligent. Thus, Equifax's omission does not constitute a proximate cause of Patton's fall and subsequent death.

The inspection took place in October 1988. In the summer of 1988 the Fire Department gave Diamond Chemical one year to relocate or bring the elevator up to the Life Safety and Fire Code requirements. In August of the following year, Diamond Chemical was given another thir-

ty days in which to meet *Code* requirements. The elevator had not been brought up to the *Code* requirements when Patton fell that October. Ventresca and Diamond Chemical had not complied with the orders of the Fire Department which could shut down the building. Was it feasible that they would listen to the company hired by their insurer to conduct a survey of the premises merely for rate purposes? The failure of Diamond Chemical and Ventresca to alter the elevator after the citation by the Fire Department and the thirty-day warning are superseding causes, even assuming Equifax's failure as a proximate cause of the fall.

### THE CODE

■ Plaintiff argues that Equifax, as the agent of the insurer, can be held liable under the *Code*. Equifax is correct when it argues that plaintiff omitted relevant parts of the *Code* in his brief.

The *Code*, in § 2602, does place the responsibility for periodic tests and inspections on the owner's insurance company or its authorized agent, as plaintiff states. However, the *Code* continues that these tests and inspections can also be done by an authorized elevator inspection agency that has been approved by L & I. Inspections are not limited to the insurance company or its agent.[6] Plaintiff also omits § 2604.1, "[t]he owner or legal agent shall make or cause to be made all periodic tests and inspections, ..." Section 2604.5 was cited by plaintiff as requiring the insurance company, its agent or an approved inspection agency investigate the cause of "the accident" and report its findings to L & I. However, plaintiff's argument omitted the first sentence of the section wherein the *owner* is required to immediately report to L & I every personal injury accident or damage to the apparatus. The following sentence, mentioning damage to any part of the apparatus or mechanism, then refers to the insurance company, its agent or the authorized inspection agency.[7] The elevator is to be shut down until inspected and a verified copy of the report is submitted to L & I certifying fitness for continued use.

The insurance agency and its agent are concerned only with the inspection of the elevator after the elevator itself has been damaged. No duty is given to the insurance agency, its agent or the authorized elevator inspection agency when there has been a personal injury. The City could easily have included personal injury accidents within the sentence as is included in

6.  Periodic tests shall be made by the owner's insurance company or its authorized agent or by an authorized elevator inspection agency approved by the code official, and shall be made at the expense and responsibility of the owner. Where such tests are not made by the code official, the result of the test shall be reported to the code official on an approval form not more than thirty (30) days after completion of the tests.
    *Wilmington City Code* § 2602.3.1.
    Periodic inspections shall be made by the owner's insurance company or its authorized agent or by an authorized elevator inspection agency approved by the building official. The authorized insurance company, its agent or the inspection agency shall submit a detailed written report of the inspection to the code official on forms approved by him not more than thirty (30) days following the completion of such inspection.
    *Wilmington City Code* § 2602.3.2.

7.  The owner of the building shall immediately notify the code official of every accident involving personal injury or damage to apparatus on or about or in connection with any equipment covered by this article, and shall assist the code official's investigation of such an accident. When an accident involves the failure, breakage, damage or destruction of any part of the apparatus or mechanism, it shall be unlawful to use such device until after an examination by the owner's or his legal agent's insurance company or its authorized agent or an authorized elevator inspection agency of the equipment for continued use, submittal of a verified or certified copy of such examination and approval of equipment for continued use by the insurance company or its agent or an authorized elevator inspection agency to the code official, and issuance by the code official of a certificate of registration as required by the provision of this article. The owner's or his legal agent's insurance company or its agent or an authorized elevator inspection agency shall make a prompt examination into the cause of the accident and shall file a certified or verified copy of a full and complete report thereof with the code official. Such records shall be open for public inspection at all reasonable hours.
    *Wilmington City Code* § 2604.5.

the previous sentence. The Court believes the omission was deliberate. "In interpreting a [code section], this Court will assume that where a provision is found in part of a statute but is omitted from another, the [City Council] was aware of the omission and intended it." *Burns v. United Services Automobile Assoc.*, Del.Super., C.A. No. 90C–MR–60, Herlihy, J. at 5, 1991 WL 53399 (March 14, 1991).

Equifax did not perform the survey in response to a report of an accident. Diamond Chemical did not ask the insurer to conduct the required periodic tests or inspections. The insurer asked Equifax to conduct the survey in order to determine the risk assessment and premium determination. Because Diamond Chemical did not ask that the inspection be done, there was no duty running from Diamond Chemical to the insurer and, thus, to Equifax. The insurer and Equifax did not assume any duty to Diamond Chemical. The Court finds that Equifax did not have a duty to Diamond Chemical or Patton under the *Code.* Equifax's duty ran only to the insurer.

### NUISANCE

■ Equifax claims that it cannot be held liable in nuisance as it did not have possession of or control over the premises. Plaintiff answers that Equifax can be held liable for its failure to abate a nuisance.[8] He adds that the premise in *Clark v. Employers Mutual of Wausau*, E.D.Pa., 297 F.Supp. 286 (1969), does not support Equifax' argument.[9] Equifax responds that before liability on a public nuisance can be found, there must first be a duty to the injured party and control by the defendant over the nuisance or the property itself. It concluded that, since it did not have possession or control, it cannot be found liable for the nuisance.

*Clark* states that "[a]s prerequisites to recovery in these situations, it must be shown either that harm is suffered because the policyholder relied on the undertaking, the inspection, or that the insurer's failure to exercise reasonable care increased the risk of harm." *Clark*, 297 F.Supp. at 289. Thus, for the insurer to be found liable, two prerequisites must first be met. There must be either reliance or an increase in the risk of harm. Neither element on the part of Diamond Chemical or Patton has been found in this case by this Court.

· In the last paragraph of section V of its reply brief discussing nuisance, plaintiff states "the analysis in *Clark* simply leads us back to the question of duty under Restatement of Torts Section 324(A) [sic], ... Accordingly, we rely on our position there stated." Plaintiff's Reply Brief at 35. Because the Court has already determined that Equifax did not have a duty under § 324A, there will be no further discussion of nuisance.

### CONCLUSION

The Court has found that Equifax did not owe a duty to Patton. Even though the

---

8.     (1) A public nuisance is an unreasonable interference with a right common to the general public.
    (2) Circumstances that may sustain a holding that an interference with a public right is unreasonable include the following:
    (a) whether the conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience, or
    (b) whether the conduct is proscribed by a statute, ordinance or administrative regulation, or
    (c) whether the conduct is of a continuing nature or has produced a permanent or long-lasting effect, and, as the actor knows or has reason to know, has a significant effect upon the public right.
    *Restatement (Second) of Torts* § 821B.

A private nuisance is a nontrespassory invasion of another's interest in the private use and enjoyment of land.
    *Restatement (Second) of Torts* § 821D.

9. [A]n insurer which actually undertakes a safety inspection of a policyholder's machinery and plant may be found liable for injuries caused by dangerous conditions or defects in two situations. Liability will be imposed on the insurer if the inspection is negligent; where the inspector fails to exercise reasonable diligence to discover the existence of defects or dangerous conditions. Similarly, where the defects in the policyholder's machinery and working place are discovered by the insurer during a safety inspection, the insurer is liable if it fails to properly inform the policyholder of the defects.
    *Clark*, 297 F.Supp. at 289.

Court found that Equifax did undertake a duty, that duty did not run to Patton. Thus, it was not shown that liability existed under *Restatement (Second) of Torts* § 324A. Patton assumed that risk of working near the unguarded elevator shaft. It was found that Equifax's failure to find the *Code* violations and report those violations was not a proximate cause of Patton's fall.

Equifax did not have a duty under the *Code* as Ventresca or Diamond Chemical did not request that an inspection or test be performed. Equifax is not liable under the theory of nuisance as there was no reliance by Patton or an increase in the risk of harm. The cases mentioned from other jurisdictions are all distinguishable from the case before this Court. As for plaintiff's argument concerning Continental's advertisements, the brochures were published by Continental without input from Equifax.

For the reasons stated above, the motion of Equifax Services, Inc. and White and White Inspection and Audit Service, Inc. for summary judgment is **GRANTED.**